**Brian James GRIFFIN, Plaintiff,**

v.

**Richard F. DANIEL, Defendant.**

**Civ. A. No. 89–0009–C.**

United States District Court, W.D. Virginia, Charlottesville Division.

July 17, 1991.

---

David C. Dickey, Stanardsville, Va., for plaintiff.

Robert W. Jackson, Michie, Hamlett, Lowry, Rasmussen & Tweel, Charlottesville, Va., for defendant.

## MEMORANDUM OPINION

MICHAEL, District Judge.

This action was brought by Brian J. Griffin against Richard F. Daniel, Jr. for violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq* (1988). Griffin claims that Daniel is liable to him for double minimum wage and overtime compensation for unpaid work and for attorney's fees. Because the interpretation of the FLSA is a federal question, this court has jurisdiction pursuant to 28 U.S.C. § 1331 (1988). The matter was tried without a jury.

To summarize briefly, Brian Griffin alleges that he moved from North Carolina to Virginia in August 1987 and was employed there by Frank Daniel, who lived with Griffin's aunt. Daniel, the evidence shows, is the commercial magnate of tiny Ruckersville, Virginia, where he owns and operates numerous businesses including the Colonial Truck Stop, the D–Ways Store, the Happy Days Restaurant, and Daniel's Trailer Park, among others. Griffin alleg-

es that shortly after his arrival in Ruckersville he began to work for Daniel, first at the restaurant, then briefly at the truck-stop and trailer park, and finally, from the spring of 1988 through October 7, 1988, at the D–Ways grocery store. The issues presented at trial were whether these businesses are subject to the Fair Labor Standards Act; and if so, whether Griffin was Daniel's "employee" within the meaning of the Act; and finally, whether or not Daniel may prevail on his counterclaim for $2,500 allegedly converted by Griffin.

At the outset, the court notes with dismay that it found the parties' and the witnesses' testimony at odds even where insignificant background facts were at issue. This is not to say that these individuals perjured themselves; rather, it is simply to emphasize the stark contrast between the parties' characterizations of the facts. Moreover, the court suspects that the good folk of Ruckersville who testified for the parties (quite entertaining at times), took some artistic liberties with the facts and perhaps exaggerated—ever so slightly— their respective observations.

By way of example, and to develop further the disputed facts, the court notes that even the history of Griffin's arrival is disputed: He claimed he telephoned Daniel from North Carolina, who told him that he would find some menial work for Griffin in Ruckersville. But Griffin's aunt contended that she rejected three attempts by Griffin to invite himself to Virginia to work for Daniel before he finally arrived at their doorstep late one night and ensconced himself in Daniel's home for a month. (It is not disputed that her cooking had something to do with Griffin's subsequent withdrawal to quarters in a recreational vehicle parked behind the house).

The saga goes something like this: Griffin alleges that he immediately after his arrival in Ruckersville began working for Daniel by helping the contractors who were restoring the old schoolhouse that was to become the Happy Days Restaurant. By contrast, his aunt recalled that "all I ever saw him do was watch TV on a pretty much full term basis." Griffin claims that once the restaurant opened in the fall of 1987 he worked as a "soda jerk" and "you could probably say assistant manager in a way, too." Naturally, this could not be corroborated by the original manager, who after being fired, stole the restaurant's books, and disappeared forever from Ruckersville. Griffin next claims that he worked at the restaurant in the truck-stop in February 1988 for two or three weeks. But opposing witnesses at trial remembered only that he was always eating, talking, or "hanging around" the truck stop restaurant. Griffin also claims to have done some odd jobs at the trailer park. Again, an opposing witness who was paid for minor contracting jobs at the trailer park recollected only that Griffin mostly just talked to him. Thus, according to Griffin, for the first five or six months he was in Ruckersville, he daily worked long hours (including a substantial amount of overtime) seven days a week for Daniel at one or the other of Daniel's businesses. Daniel rejects this claim entirely.

Griffin began in spring 1988 to work at the D–Ways Store which had until then been losing money for Daniel. Daniel relieved the three women who had been working there, and allowed Griffin to operate the store by himself from 7:00 a.m. every morning until 11:00 p.m. every evening from March through October 1988. That much is agreed upon. An issue exists as to whether Griffin was an employee of Daniel or his partner in the operation of the store. Griffin argues the former, Daniel the latter. The court does not resolve that issue in this opinion.

There are other points of contention too: Griffin says that he was never paid during the entire one and a half year period. He claims that he asked Daniel "a hundred times" to be paid, but that Daniel only gave him an occasional twenty dollar bill and told him that he had no money.[1] On the other hand, Daniel contended that every two weeks during which Griffin operated

---

1. It is undisputed that Griffin never completed a W–2 form during his entire stay in Ruckersville, and was never issued a check by any of Daniel's operations.

D–Ways he loaned Griffin $200 dollars cash as an advance against end-of-the-year partnership profits. He also notes that none .of these advances were ever repaid. In addition, Daniel explains that Griffin dined on the house at the truck stop restaurant and that Griffin was allowed to take food from the store. As for accomodations, Griffin was treated· first to a room Daniel's own house, then to space in a camper outside, and finally to quarters in the truck-stop and D–Ways buildings.

## I.

■ The first issue for resolution is whether or not three of the Daniel businesses Griffin claims to have worked for are exempt from the wage and overtime requirements of the FLSA. Title 29 U.S.C. § 213(a)(2) (1982)[2] exempts "retail or service establishments" more than fifty percent of whose sales of goods or services occur within one state, and which are not "enterprises" as defined by 29 U.S.C. §§ 203(r), (s). The parties have stipulated that unless found by the court to be a common enterprise under definitional sections 203(r) and (s), the three businesses are entitled to the section 213(a)(2) exemption.

Prior to 1961, the FLSA's minimum wage and maximum hour provisions covered only employees who were "engaged in commerce or in the production of goods for commerce." 29 U.S.C. §§ 206(a), 207(a); 29 C.F.R. § 779.200 (1990). Amendments to the FLSA in 1961 expanded the Act's coverage to all employees of an "enterprise" engaged in commerce or in the production of goods for commerce, regardless of the employees' direct involvement. *See* Act of May 5, 1961, Pub.L. 87–30, § 2(c), 75 Stat. 65; 29 C.F.R. § 779.201 (1990). Thus, the question of enterprise status becomes very important to claimants like Brian Griffin who allegedly were not directly engaged in commerce or the production of goods for commerce.

Under the FLSA, an "enterprise" need not be a single business. The definition incorporates "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments." 29 U.S.C. § 203(r) (1988). The Fourth Circuit and other courts of appeals have distilled a three-part test to determine whether or not two or more employing entities constitute a common enterprise. *See Brock v. Hamad,* 867 F.2d 804, 806 (4th Cir.1989); *Shultz v. Falk,* 439 F.2d 340, 345–46 (4th Cir.1971), *cert. denied* 404 U.S. 827, 92 S.Ct. 62, 30 L.Ed.2d 56 (1971); *see also* 29 C.F.R. §§ 779.200–224 (1990). First, the trial court must determine whether or not the businesses engage in related activities. *See Hamad,* 867 F.2d at 806. Second, the trial court must determine whether or not the businesses are subject to common control. *See id.* Third, the trial court must determine whether or not the businesses are linked by a common business purpose. *See id.*

One of the Fourth Circuit cases applying this test is *Brock v. Executive Towers, Inc.,* 796 F.2d 698 (4th Cir.1986) (per curiam). In that case, the Fourth Circuit held that three incorporated businesses (a lounge that featured topless entertainment, an adult bookstore, and an x-rated video arcade) were a common enterprise under the Fair Labor Standards Act. The Fourth Circuit found that they all engaged in related activities, that they all were subject to common control, and that they all had a common business purpose, namely providing erotic entertainment to the general adult population. The Fourth Circuit reached a similar conclusion in *Hamad,* in which two real estate management businesses controlled by members of the same family were found to be a common enterprise. The related activities and common business purpose prongs were met although one of the firms managed an apartment complex and the other managed sin-

**2.** Subsection (a)(2) was repealed in 1989. *See* Act of Nov. 17, 1989, Pub.L. 101–157, § 3(c)(1), 103 Stat. 939. It is undisputed, however, that (a)(2) governed the conduct of the parties during the interval in question.

gle family home properties. *See* 867 F.2d at 806–07.

The prongs of the test are conjunctive, not disjunctive. Therefore, if the businesses fail to meet any one of the three prongs of the test, then there can be no common enterprise under the Act. Because Daniel practically concedes the common control question, the court will now focus on the other prongs of the test. Regulations promulgated by the Labor Department under the Act seem to merge the common business purpose prong into the related activities prong: "Generally, the answer to the question whether the activities are 'related' or not, will depend in each case upon whether they serve a business purpose common to all the activities of the enterprise, or whether they serve a separate and unrelated business purpose." 29 C.F.R. § 779.206(b) (1990); *see also Executive Towers*, 796 F.2d at 700. The court, therefore, now turns its attention primarily to the common business purpose prong.

The plaintiff attempts to establish a common business purpose by introducing evidence of interchangeability of supplies, commingling of funds, and the exchange of employees among businesses. This evidence seems to go more to the related activities prong than to the common business purpose prong, *see Dole v. Odd Fellows Home Endowment Board*, 912 F.2d 689, 692 ("the critical inquiry is whether there is 'operational interdependence in fact' "), *reh'g denied* 1990 WL 119661, 1990 U.S.App. LEXIS 22,985 (4th Cir.1990). However, because the two prongs are closely linked, the court will accept plaintiff's proposition and assess his evidence.

Griffin demonstrated that Daniel made substantial deposits into D–Ways' checking account from his personal account, presumably the repository of his profits from his several businesses. These deposits allowed the store, which was losing money, to meet its various obligations to vendors. Thus, not only did funds flow between the businesses through the conduit of Daniel's personal account, but proceeds from the profitable businesses helped to support a failing business. In addition, Daniel on his Form 1040 used losses from the store to offset gains from the other businesses.

Griffin also produced sufficient evidence to establish that the businesses occasionally borrowed employees from one another, and that the restaurant occasionally used inventory from the store (catsup and ice, for example). He failed, however, to prove that these borrowings were wide spread. Moreover, Daniel's bookkeeper explained that managers of the entities were required to record for accounting purposes goods received or employees borrowed from other Daniel businesses, and Griffin's testimony that individual employees failed properly to account for such borrowings does not persuade the court that the businesses were truly interdependent.

■ In addition to the evidentiary shortcomings, the Labor Department regulations suggest that Griffin has not satisfied his burden of proof. The business activities in question must be "directed toward the same business objective" or towards a similar objective in which "the group has an interest." 29 C.F.R. § 779.213 (1990); *Hamad*, 867 F.2d at 807. The common-business-purpose prong appears to have been easily satisfied in *Executive Towers* and *Hamad* by the respective goals of providing erotic entertainment and real estate management services. In the case at bar, the court is hard pressed to see a common business purpose between a restaurant, a small grocery store, and a trailer park. The Labor Department regulations explain that "[i]f, for example, one individual owns or controls a bank, a filling station, and a factory, the mere fact of common ownership will not make them one enterprise." 29 C.F.R. § 779.211 (1990). The profit motive alone has long been understood to be insufficient to support a finding of a common business purpose. *See Wirtz v. Columbian Mutual Life Insurance Company*, 380 F.2d 903, 907 (1967); *Brennan v. Veterans Cleaning Service, Inc.*, 482 F.2d 1362, 1367 (5th Cir.1973). If it were not, the common business purpose prong would be rendered meaningless.

The court cannot see why the Labor Department's example would change even if

the hypothetical common owner invested in his filling station or factory using dividends from his banking business. The court has found no cases to suggest that under the FLSA an owner's occasional cash contribution to one business, by itself proves related activities or a common business purpose between that business and the owner's other businesses.

■ Nor can the court find a common business purpose on the basis of minor instances of exchanged inventory and employees. To do so would unjustly penalize businessmen in small communities who must of necessity manage their businesses somewhat differently than their brethren in larger communities.[3] Because the court finds that no common business purpose existed, it concludes that the businesses do not qualify under the Act as an enterprise, and therefore Griffin's FLSA claims for wages earned at the restaurant, the trailer park, and the store must fail.

## II.

■ Despite this court's legal conclusion that three of Daniel's businesses were exempt from the coverage of the Act by virtue of the section 213(a)(2) exemption, Griffin's claim is not yet disposed of entirely. He also alleges that he spent two weeks during February of 1988 at the Colonial Truck Stop. The parties have stipulated that the truck stop was not a retail or service establishment eligible for the § 213(a)(2) exemption, and that its earnings exceeded the $500,000 gross volume of sales requirement for enterprise status. *See* 29 U.S.C.A. § 203(s)(1)(A)(ii) (Supp. 1991). As his only defense against Griffin's FLSA claims for work performed at the truck stop, Daniel maintains that Griffin was not an employee of the truck stop. It now is the job of the court to review the evidence and determine whether as a matter of fact an employment relationship existed between Griffin and Daniel at the truck-stop. *See Skidmore v. Swift & Co.,* 323 U.S. 134, 137, 65 S.Ct. 161, 163, 89 L.Ed. 124 (1944) (because the law does not

impose an employment relationship upon the parties, it "imposes upon the court[ ] the task of finding what the arrangement was.").

The court for two reasons finds that such a relationship, in fact and in law, did exist. First, it finds the testimony of Daniel's witnesses that Griffin never worked at the truck-stop to be unconvincing. Instead, it finds that for a period of over a year and a half, an unusual, unwritten employment relationship existed between Griffin and Daniel. Even if Daniel's witnesses were unbiased, their testimony may have been incorrect because they were unaware of that relationship. Second, under the "economic reality" test, an employment relationship exists when as a matter of economic reality, the employee depends on the employer for his livelihood. *Howard v. Malcolm,* 852 F.2d 101, 104 (4th Cir.1988). The court finds this rule to be applicable here, because Griffin was dependent on Daniel for all of his needs.

### A.

Griffin offered into evidence, and the court admitted, a calendar on which he recorded his hours worked for Daniel. The calendar discloses that Griffin worked at the truck stop from 10:00 a.m. until 5:00 p.m. for ten days in the first half of February. Because he took no days off and worked weekends, twenty-three hours of his total of seventy hours worked during those ten days were overtime hours, chargeable at a rate of $5.02 per hour. The remaining forty-seven hours were regular hours, chargeable at $3.35 per hour, the minimum wage during 1988. Under the minimum wage and maximum hour provisions of the FLSA, during the ten day interval in question, Griffin should have earned $272.90 if he in fact was employed by Daniel.

Daniel denies that Griffin ever was employed at the truck stop. In support, several patrons testified that they visited the truck stop regularly, but could not recall ever having seen Griffin work there. The

---

**3.** In addition, the exchanges of inventory and employees do not prove operational interdependence in fact, the standard for the related activities prong. *See Odd Fellows,* 912 F.2d at 692–93.

former manager and assistant manager also testified that Griffin was never "employed" there. However, they both hedged their answers by noting that they had never "seen" him work there or have "knowledge" of his having worked there. The court notes this hedging because it considers both witnesses to have been biased towards Daniel. This leaves open the possibility that Griffin could have worked at the truck stop without their being fully aware of it. Griffin lived in an apartment at the truck stop during February, and spent a considerable amount of time eating and socializing there for a period of about a year-and-a-half. He only claims to have worked at the truck stop for a brief ten day interval. When he was working there in February, it is quite possible that the patrons, and for that matter, even the manager and assistant manager could have seen Griffin there without having given a second thought about his presence. In addition, testimony at trial showed that Griffin was not a hard worker. This created the impression that he could have "worked" for a day without accomplishing a great deal.

Several facts are pertinent to the court's finding that an employment relationship existed between Griffin and truck-stop. First, as far as the court is concerned, the facts that Griffin never completed a W–2 form and never was paid as an employee of the truck-stop do not weigh against him. Griffin never filed a W–2 form, nor was he paid for work performed at *any* Daniel business (with the exception of small unrecorded cash advances). Nor was he ever interviewed or formally hired by any Daniel enterprise, with the possible exception of the D–Ways store. The fact that patrons and managers at the truck-stop were unaware of his status is not at all surprising. Instead, it fits neatly into a clear pattern of informal employment.

Thus, an important background factor in determining whether Griffin was employed at the truck-stop for ten days is the year-and-a-half long informal employee-employer relationship that existed between Griffin and Daniel as individuals. It began the first day Griffin arrived at Daniel's house in Ruckersville, when Daniel showed him the construction site at the old school house, and asked Griffin if he would like to change his clothes before he began to clean up the premises. Daniel never formally "hired" Griffin—Griffin just showed up on his doorstep, and Daniel put him to work. When the Happy Days Restaurant in the school house opened for business, Griffin's transition to the position of "soda jerk" was similarly undisturbed by the tedious rituals of a more formal employment relationship.

The manner in which Griffin came to be employed at the construction site and the restaurant established a pattern. Daniel appears to have allowed Griffin to drift from job to job without ever observing the formalities of termination and hire. This adequately explains the uncertainty surrounding Griffin's work at the truck-stop. Even if the manager and assistant manager of the truck-stop restaurant are to be believed when they claim Griffin was never their employee, it may be because they were never aware that Daniel sent Griffin over to work informally in the truck stop for a week.

It is clear that Griffin performed numerous services for Daniel throughout the year, and that Daniel took advantage of Griffin's willingness to do so. The court therefore will not excuse Daniel from all liability on the basis that Daniel kept no records and failed to observe the most rudimentary customs of the employer-employee relationship.[4] *Cf. Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946) ("Such a result would place a premium on an employer's failure to keep proper records").

### B.

The court need not inquire long into Griffin's motivations for maintaining the em-

4. This is consistent with Griffin's experience at the D–Ways store. The parties dispute whether or not Griffin was a partner or an employee.

No formal agreement appears to have existed defining the relationship.

ployment relationship with Daniel. He either performed such services voluntarily—as a friend might do for a friend—or out of a sense of obligation for the room and board he received from Daniel. The court finds no basis whatsoever for the former conclusion. In any case, the court does not believe the distinction matters in this case because the FLSA defines the word "employ" as "to *suffer or permit* to work." 29 U.S.C. § 203(g) (1988). According to the Supreme Court, "[a] broader or more comprehensive coverage of employees ... would be difficult to frame." *United States v. Rosenwasser,* 323 U.S. 360, 362, 65 S.Ct. 295, 296, 89 L.Ed. 301 (1944).

The court finds very useful in analyzing the facts at hand, the "economic reality" doctrine, which has frequently been applied in recent years when the Secretary of Labor has sued religious organizations for violations of the FLSA. The leading example is *Tony and Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985). In that case, the Foundation, a nonprofit religious organization, derived its income from the operation of commercial businesses staffed by its adherents, who for the most part were recovered drug addicts and criminals before the Foundation converted them. When the Secretary of Labor prosecuted the Foundation under the FLSA, its workers claimed that they were not employees because they were volunteers "working for religious or evangelical reasons." *Id.* at 293, 105 S.Ct. at 1957. The Supreme Court rejected the argument that the "volunteers" were not employees because they did not expect compensation in the form of ordinary wages. The district court had previously found that the "volunteers" were "entirely dependent upon the Foundation for long periods," and had stated that the in-kind benefits they received were wages in another form. *Id.* at 301, 105 S.Ct. at 1961. The Supreme Court agreed, noting that the test of employment is one of "economic reality," *id.,* and that if an exception existed for volunteers, then "employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protec-

tions under the Act." *Id.* at 302, 105 S.Ct. at 1962. *See also Dole v. Shenandoah Baptist Church,* 899 F.2d 1389, 1397 (4th Cir.1990) (refusing to create an exception "capable of swallowing up the rule.").

This analysis sheds useful light on the situation at hand. Because no party has argued that Griffin volunteered to work for Daniel for a year and a half, it appears most likely that Griffin knew he must work, or else leave. Throughout his tenure in Ruckersville, Griffin was paid in kind, providing in the court's opinion additional evidence of the existence of an employment relationship. According to the testimony of Nancy Lawson, who lived with Daniel and provided the family link that brought Griffin to Ruckersville, she strongly discouraged Griffin from moving to Ruckersville from the beginning. Moreover, the court senses that all was not well between Griffin and Lawson and Daniel, and that Daniel would not cheerfully have housed and fed an unemployed inlaw indefinitely. The implication is that Daniel understood Griffin was working, and thus was able to justify housing and feeding Griffin. More importantly, Griffin understood that he had to work in order to survive.

There is additional evidence of the economic reality of Griffin's employment. For the period during which he lived behind the truck-stop, Griffin's quarters were so squalid that he complained about the filthy conditions until he was moved. Without any pay he was in no position seek and rent a room on his own. His only option was to request that Daniel find a better place for him. His dependency on Daniel was complete.

It is therefore the decision of this court that Brian James Griffin worked for Frank Daniel at the Colonial Truck Stop for a period of approximately two weeks during February 1988. As for the dollar amount in question, the court has already noted that it calculates that Griffin would have been due $272.90 for his ten days of work at the truck-stop.

C.

▮ Daniel contests in his brief the actual number of hours Griffin allegedly

worked, as reported in Griffin's calendar. However, the Supreme Court long ago decided that when an employer fails under the FLSA to maintain a record of an employees hours worked, it may not complain of inaccuracies in its employee's records as a basis for denying relief. *See Mt. Clemens Pottery Co.*, 328 U.S. at 687, 66 S.Ct. at 1192. As discussed above, Griffin has carried the burden of showing that he performed the work in question. He has also by his calender produced "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.*

The liquidated damages provision of the FLSA dictates that the plaintiff be awarded in addition to back minimum wages and overtime compensation, "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b) (1988). The court calculates the total amount to be $545.80.

### III.

■ As a final matter, the court denies defendant's counterclaim. It finds insufficient Daniel's evidence that Griffin converted $2,500 from the cash register of the D–Ways store to his own use. The counterclaim's strongest support comes in the form of an alleged party admission made by Griffin to Nancy Lawson over the telephone, months after he had left Ruckersville, in which he wondered aloud how he would repay the converted $2,500. However, Nancy Lawson's long relationship with Daniel gives some basis for discounting her testimony, at least to a degree; and no corroborating evidence was presented to establish as a matter of fact that money was ever missing from the cash register. Moreover, it is uncontested that Frank Daniel ended the relationship between himself and Griffin by paying Griffin $200 to "leave town" and release Daniel from any claims. This conduct is irreconcilable with an allegation of conversion, given that Daniel apparently suspected Griffin of conversion at the time he dismissed him.