**Robert L. SCHLEMMER, et al., Appellants,**

**v.**

**FARMERS UNION CENTRAL EXCHANGE, INC., Respondent.**

**No. CO–86–612.**

Court of Appeals of Minnesota.

Dec. 16, 1986.

Kenneth P. Griswold, Ruttenberg, Griswold, Orren & Associates, St. Paul, for appellants.

John J. McGirl, Jr., Doherty, Rumble & Butler, Professional Ass'n, Minneapolis, for respondent.

Heard, considered and decided by CRIPPEN, P.J., and LANSING and LESLIE, JJ.

## OPINION

CRIPPEN, Judge.

Former employees of respondent Farmers Union Central Exchange, Inc. (CENEX) claim they were unlawfully discharged on the basis of age. The employees appeal the trial court's determination that they failed to establish this claim. Appellants allege inadequate findings and insufficient evidence to support the findings, conclusions, and judgment. We affirm.

## FACTS

### CENEX

Respondent CENEX is a regional farm supply cooperative that produces and markets petroleum and agricultural products. CENEX employs approximately 2500 people in several states, with headquarters in Minnesota.

In January 1981, CENEX hired Darrell Moseson as president and chief executive officer. CENEX had recently suffered substantial losses due to the impact of the economic recession on petroleum and agricultural industries, and hoped Moseson would provide some positive changes.

Moseson implemented a decentralization policy, under which lower management personnel were given the primary responsibility for hiring and firing. The personnel policy manual stated that all employee discharges were subject to review by the human resources division to ensure compliance with employment laws. Because of the decentralization, however, this policy was no longer enforced.

In late 1982, Moseson instituted the Cost Containment Plan (CCP), designed to reduce respondent's 1983 budget by $10 million dollars. Senior management instructed all supervisors to reduce costs in their divisions. Specifically, supervisors were to target inefficient or duplicative jobs for elimination.

Few guidelines or limitations were provided to the supervisors. Other than efficiency factors, the supervisors did not rely on any uniform criteria in selecting jobs for elimination. The supervisors were invited to a seminar for instruction on federal and state employment regulations. The supervisors involved in the discharge of appellants, however, either did not choose to attend or did not remember being told about the seminar.

Many of the jobs targeted by the supervisors were held by people who had been working at CENEX for several years. CENEX officers testified they were concerned about the impact of the CCP on these long-term employees and therefore considered

an incentive early retirement program for all employees 55 and over. This concept was ultimately rejected as too expensive.

Senior management then developed the Special Early Retirement Program (SERP), available only to those employees whose jobs were eliminated by the CCP and who were age 55 and over. Under SERP, the employees' benefits were computed as if the employees were retiring at age 65. In addition, from the date of their retirement until age 62, the employees were paid a monthly amount equal to what they would begin to receive in Social Security benefits once they reached the age of 62.

The execution of the CCP was swift. Managers learned of it in February 1983 and completed the task by March 1, 1983. A total of 200 people were discharged as a result, including three of the four appellants here. At the same time, CENEX continued to recruit new employees. Because Moseson believed that one of the reasons for the company's losses was its failure to keep step with technological advances, CENEX hoped to hire experienced, computer-literate persons as openings occurred. None of the appellants qualified for those jobs.

*Irene Quiring*

As a result of the CCP, Quiring, age 66, was discharged after 12 years of service. While working at CENEX, Quiring held clerical and secretarial positions.

In October 1982, Quiring's boss, Gerald Jacobsen, had been demoted and transferred to another department. Quiring was given the choice of transferring with Jacobsen or staying on as secretary for Jacobsen's replacement; she chose to transfer. When Jacobsen's new position was eliminated under the CCP, Quiring's position was also eliminated. In the division where Quiring and Jacobsen worked, 23 positions were eliminated. In addition to Quiring and Jacobsen, two other discharged employees were over the age of 40.

Because of her age, Quiring left under respondent's regular retirement program. She also received severance pay because she had only worked at CENEX for ten years. She was the only appellant who received both severance pay and retirement benefits.

Following her termination, Quiring unsuccessfully applied for other jobs at CENEX. She testified that CENEX made no attempt to encourage her further employment at the company. CENEX asserts that Quiring did not introduce any evidence that she was qualified for available positions at CENEX. Quiring responds that she had general secretarial and clerical skills that were transferable to many other CENEX jobs.

*Robert Schlemmer*

Schlemmer, age 52, was discharged after 27 years of service. His last position was as Supervisor of Office Supply & Equipment Procurement.

Schlemmer had been criticized in recent years for poor work performance. His supervisor's testimony indicated that he considered his dissatisfaction with Schlemmer in determining to eliminate his job. The job of one other employee, a 20–year old supply clerk, was also eliminated from the division where Schlemmer worked. The supply clerk's duties were absorbed by the remaining supply clerks and Schlemmer's duties were divided between three supervisors. One other person in the division was 54 years old at the time but was not discharged and is still employed at CENEX. The entire division was eliminated in 1984.

Schlemmer was too young to qualify for SERP or any other retirement program. He received 28 weeks severance pay and other accumulated benefits.

Schlemmer was unsuccessful at finding other employment at CENEX. CENEX asserts that Schlemmer did not introduce any evidence that he was qualified for available positions. Schlemmer responds that his experience with purchasing, billing, sales, service, and inventory control involved skills and knowledge that were transferable to many other CENEX jobs.

*Harold Lee*

Lee, age 60, was discharged following employment of 24 years. He worked in the

public relations division throughout his tenure at CENEX. At his retirement, he was Contributions and Membership Coordinator in the public relations division.

Lee's work history was heavily criticized by his present and past supervisors. In 1976, Lee was told to find other employment because his work quality was so poor. Upon Lee's request, however, and in consideration of his age, he was given a less demanding job. Lee's supervisor in that job also testified that Lee's work was less than satisfactory. His supervisor at the time of the discharge similarly criticized Lee's work. She stated that she and the secretaries easily absorbed Lee's work load.

All of Lee's supervisors either retired or resigned as a result of the CCP. Eventually, the entire public relations division was eliminated.

Lee, the only appellant who qualified for SERP, retired under that program. He made some limited attempts to find other employment at CENEX but CENEX claims Lee made no showing that he was qualified for other available positions. Lee did not rebut this claim.

*Gerald Kosin*

Kosin was discharged in May 1982 at the age of 49, before the CCP took effect. He had been employed by CENEX for 13 years.

Kosin had been laid-off in June 1981 due to an earlier reduction in force, but was rehired in October 1981. His new job was eliminated in March 1982 and he transferred to an inventory control specialist position on a probationary basis. During his 60–day probationary period, however, another reorganization occurred and his job position was eliminated.

Kosin's supervisors testified his performance was below standard and that he would have been discharged at the end of the probationary period. Kosin interviewed for at least six other jobs at CENEX and was not hired for any of them. CENEX asserts Kosin did not show that there were positions available for which he was qualified.

Kosin filed an age discrimination complaint with the Minnesota Department of Human Rights in December 1982. The department found no probable cause to substantiate the charge.

*Suit and trial*

Appellants claim that CENEX subjected them to discriminatory treatment. Appellants further allege that CENEX's termination policy, and the CCP in particular, had a disparate impact on them because of their age.

Appellants' expert witness, Eliyahue Stein, reviewed organizational charts of CENEX covering the period from 1982 to 1984. Stein testified that CENEX reorganized its departments frequently, if not constantly. He also reviewed listings of new hires at CENEX between April 1981 and the end of 1983. Looking at six occupational classifications, Stein determined that the percentage of people hired who were over the age of 50 ranged from a high of 13% in the sales department to a low of 3% in professional positions.

Respondent's expert witness, Howard Miller, testified that Stein's analysis excluded the crucial link between employee terminations and age because all of Stein's conclusions were based only on the rate at which CENEX hires people over age 50.

Miller also disputed the other data showing disparate impact. Of the 23 employees whose positions were eliminated in the division where Quiring worked, only four were over age 40. The only other employee terminated in Schlemmer's department was 20 years old and another employee who was 54 years old was not terminated and is still working for CENEX. No one occupied the job Lee last held either before or after he was discharged, and the entire division was eventually eliminated. Kosin, who had been laid-off at age 48, was rehired at that same age, and his discharge was not a result of the CCP.

**ISSUES**

1. Is the evidence sufficient to support the trial court's finding that appellants

failed to establish under a disparate treatment theory that CENEX discriminated against them because of their age?

2. Is the evidence sufficient to support the trial court's finding that appellants failed to establish under a disparate impact theory that CENEX discriminated against them because of their age?

## ANALYSIS

A trial court's findings of fact will not be set aside unless clearly erroneous, and due regard shall be given to the trial court's opportunity to judge the credibility of the witnesses. Minn.R.Civ.P. 52.01. Because of the significance of factual issues in employment discrimination cases and the discretion given trial courts making determinations on these issues, the basis for the court's decision must "be set forth clearly and explicitly so that an appellate court can conduct effective and meaningful review." *Sigurdson v. Isanti County*, 386 N.W.2d 715, 721 (Minn.1986).

1. "The crux of a disparate treatment claim involving an employer's decision to discharge an employee is that the employer is treating that employee less favorably than others on the basis of an impermissible classification." *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428, 442 (Minn.1983). The United States Supreme Court has established a three-step analysis for adjudicating disparate treatment claims in Title VII actions. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). In 1978, Minnesota adopted this analysis for disparate treatment claims brought under the Minnesota Human Rights Act, Minn.Stat. §§ 363.-01–.14 (1984 & Supp.1985) (enacted 1955). *Danz v. Jones*, 263 N.W.2d 395, 398–99 (Minn.1978). *See also Sigurdson*, 386 N.W.2d at 719–20; *Hubbard*, 330 N.W.2d at 441–42.

Initially, the employee has the burden of establishing a prima facie case of disparate treatment. This is done by showing (1) the employee is a member of a protected class; (2) the employee was qualified for the job from which he or she was discharged; (3) the employee was discharged; and (4) the employer assigned a nonmember of the protected class to do the same work. *Hubbard*, 330 N.W.2d at 442.

If a prima facie case is established, a presumption is created that the employer unlawfully discriminated against the employee. *Id.* at 441–42 n. 12 (citing *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). The burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employment action." *Id.*

Finally, if the employer shows a valid reason for its action, the plaintiff has the ultimate burden of persuading the court by a preponderance of the evidence that the employer's stated reason was pretextual. This burden is sustained either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's explanation is unworthy of credence. *Id.*

▪ The trial court explicitly applied the three-step *McDonnell Douglas* test, concluding that respondent prevailed on each step. Appellants argue the court failed to satisfy *Hubbard*, however, because it did not detail the basis for its initial finding that no prima facie showing had been made. *See id.* at 442 (prima facie case consists of four elements). We cannot agree. The court's findings, as well as its memorandum accompanying the order denying a new trial, reveal consideration of all the factors listed in *Hubbard*.

▪ Further, the record amply supports the general finding that appellants failed to establish a prima facie case. The evidence of the poor work performance on the part of Schlemmer, Lee, and Kosin showed they were not qualified for the jobs from which they were discharged or for alternate jobs at CENEX. Although Quiring was qualified for her job, no employee was assigned to do her work because the job was eliminated. Lee and Schlemmer's claims also fail in this respect.

■ Even if a presumption that CENEX unlawfully discriminated against appellants could be established, the trial court found, and we concur, that CENEX articulated a legitimate nondiscriminatory reason for its actions. The CCP targeted jobs that were inefficient or duplicative as part of its legitimate goal of reducing costs. Efficiency can be measured at least in part by the quality of work produced by the employee holding the job. The department formerly headed by Jacobsen, Quiring's boss, had lost over $600,000 in each of two previous years under his leadership, while his successor ended his first year in the position with a $600,000 gain. A total of 23 employees, including Quiring and Jacobsen, were discharged from that department by the CCP. The CCP had other harsh results, including the elimination of the entire division where Lee worked. The need to reduce costs, however, is supported by evidence of respondent's financial losses.

■ There is no doubt that some pretext was involved in the individual selection of these appellants for discharge. Supervisors were instructed to review "positions, not people," yet testimony revealed that the work record of individual employees influenced the supervisors' choices. Further, none of the employees were told that the reason for their discharge was inadequate work performance and each received complimentary letters of reference upon request. Individualization by performance, however, is not discriminatory. We observe that there may be an inevitable relationship between age and qualification in a changing industrial operation. Still, appellants have not shown in this case that it was their age and not their lack of qualifications that brought about their selection for discharge.

Because CENEX did not treat employees less favorably on the basis of an impermissible classification, the trial court properly found that appellants failed to show that their discharges were a result of discriminatory disparate treatment.

■ 2. At trial, appellants emphasized their claims of disparate treatment, and the trial court's findings reflect this. On appeal, however, appellants focus on the evidence of disparate impact. A claim of disparate impact differs from disparate treatment in that the employee need not show that the employer was motivated by a discriminatory intent; it is only necessary to demonstrate that a facially neutral employment practice actually operates to exclude from a job a disproportionate number of members of the protected class. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 431–32, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971) (seminal disparate impact theory case); *Leftwich v. Harris-Stowe State College,* 702 F.2d 686, 690 (8th Cir.1983) (applying disparate impact theory to claims under the federal Age Discrimination in Employment Act (ADEA)). Statistical evidence is the most frequently used tool in establishing a prima facie case of disparate impact. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977); *Leftwich,* 702 F.2d at 690.

To rebut the prima facie case, an employer may present contrary interpretations of the plaintiff's statistical data or introduce its own data that casts doubt on the original inference of illegal discrimination. This approach goes only to the quality of the plaintiff's evidence. When the plaintiff's evidence is uncontroverted, the employer may nevertheless avoid a finding of illegal discrimination by showing that the employment practice is job-related in that it directly measures a skill needed for the job or that the plan was justified by business necessity. *Griggs,* 401 U.S. at 431–32 & 436, 91 S.Ct. at 853–54 & 857. The employer must show that its selection plan "has a manifest relationship to the employment in question" and that there is a "compelling need" to maintain that practice because alternative practices with a lesser discriminatory impact are not available. *Leftwich,* 702 F.2d at 692 (quoting *Hawkins v. Anheuser-Busch, Inc.,* 697 F.2d 810, 815 (8th Cir.1983)); *see also Hubbard,* 330 N.W.2d at 441–42 n. 12.

Finally, if the employer successfully establishes a legitimate business defense, the plaintiff may still prevail by showing an alternative practice that the employer could use to achieve its desired end without having the illegal disparate impact.

■ Appellants present well-documented evidence that the facially neutral CCP was administered in a potentially discriminatory manner. Minor supervisors were delegated the authority to select employees for discharge without any monitoring to ensure compliance with discrimination laws. This lack of control endangered the otherwise legitimate practice of cost reduction. The incentive to select employees who would qualify for SERP and the testimony of Lee's supervisors in particular further indicate age was a factor in the supervisors' choices.

The danger of discrimination, however, was not substantiated by evidence demonstrating that the CCP affected a disproportionate number of older employees. Appellants' evidence is as weak on this crucial element of the prima facie case as it is strong on the evidence of the dangers of the employer's practices. For example, appellants' statistical evidence showed only the rate at which CENEX was hiring older employees. Appellants failed to show the court how many of the 200 discharged employees were over age 40.

Moreover, the only evidence regarding the ages of a significant number of the affected employees was that only four employees of the 23 employees discharged from Quiring's division were over age 40. The evidence showed other older employees were not discharged. Appellants did not satisfy their burden of establishing a prima facie case of discriminatory disparate impact.

### DECISION

The trial court properly concluded that appellants failed to prove discrimination under either a disparate treatment or a disparate impact theory.

Affirmed.