Brian KOHN, Respondent,

v.

CITY OF MINNEAPOLIS FIRE DEPARTMENT, Civil Service Commission, Appellant.

No. C5-97-2075.

Court of Appeals of Minnesota.

Aug. 25, 1998.

Review Denied Oct. 20, 1998.

---

Sonja Dunnwald Peterson, Minneapolis, for respondent.

Jay M. Heffern, Minneapolis City Attorney, Larry L. Warren, Assistant City Attorney, Minneapolis, for appellant.

Considered and decided by AMUNDSON, P.J., PETERSON and SHUMAKER, JJ.

## OPINION

SHUMAKER, Judge.

The district court found that the Minneapolis Fire Department's 1991 fire captain's examination had a statistically significant adverse impact on minority firefighters and awarded damages to minority firefighter Brian Kohn, who took the test but was not promoted. The fire department appeals, contending that the statute of limitations bars Kohn's claim and that the record did not support the finding of disparate impact or the award of damages. We affirm in part and reverse only as to the award of damages for harm to Kohn's reputation.

## FACTS

The facts for the most part are undisputed. The Minneapolis Fire Department (MFD) has a history of discriminatory employment practices against racial minorities. *Carter v. Gallagher*, 452 F.2d 315, 323 (8th Cir.1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972). The MFD employed almost no minority firefighters since 1930 until a 1979 consent order arising from *Carter*. Hispanics were among the protected classes identified in *Carter*. Testimony indicated that among minority groups, the MFD was most discriminatory against Hispanics in recruitment, hiring, and integration. The district court found that because of these recent discriminatory practices, "firefighters of color are still few in number at the MFD."

Respondent Brian Kohn is of Mexican national origin and is referred to as being Hispanic. He began working for the MFD as a firefighter in February 1986. In 1991, the MFD gave notice that it would hold an examination to create a list from which it would promote firefighters to the position of fire captain. Kohn applied for the promotion in February 1991. In addition to meeting the training and seniority requirements, he had performed the duties of captain "out of grade" on numerous occasions since 1990.

For the 1991 test, the MFD changed the weighting it had previously used to grade exams. It did so because it had determined that earlier examinations, which were based only on the results from a written test, had an adverse impact on minorities. Traditionally, minorities did better on the assessment center simulation examinations that replicated parts of the job and contained more job-related criteria. The MFD decided to weight the assessment center scores at 45%, the written exam results at 45%, and seniority at 10%. It had considered giving the assessment center scores even more weight but ultimately did not do so because of its history of reliance on the written portion and because the firefighters union protested the plan.

The MFD administered the fire captain's exam in April 1991. Of the 36 applicants who took the written portion of the exam, 33 passed and went on to take the assessment portion. Of these 33 applicants, 19 were non-minorities and 14 were minorities, including four Hispanics, five African Americans, and five Native Americans.

The MFD scored the exams and created an eligibility list, ranking the applicants in order of their scores. The MFD then used the list to make promotions in rank order to fire captain as the positions became available during the two-year period from August 26, 1991, to August 26, 1993. The MFD promoted 17 firefighters from the list; 13 were non-minority firefighters and four were minority firefighters, including three Native Americans and one Hispanic. The last promotion from the 1991 list occurred on July 14, 1993.

The MFD informed Kohn that he was ranked 20th on the list, but it did not publish the promotion list with names or rank of all of the applicants. Because only 17 vacancies for the captain position occurred, MFD did not promote Kohn. It was not until a May 1994 union meeting that Kohn learned that several African American firefighters who took the exam had brought charges of disparate impact discrimination. Although that matter had been settled, the parties were subject to a confidentiality order until October 4, 1994.

Kohn then filed a charge of discrimination with the Minneapolis Department of Civil Rights on July 8, 1994. The department dismissed the charge on February 14, 1995, as untimely. Kohn next began the district court action against MFD on April 4, 1995.

Meanwhile, as part of the 1994 settlement with the African American firefighters, the MFD modified the fire captain's exam, changing the written test to pass/fail and no longer including the written scores in the ranking. The MFD also established objective reviewing standards for the assessment center portion of the exam. It agreed to take affirmative steps to promote more minorities to the rank of captain.

At the end of 1994, the MFD gave notice that it would hold a new fire captain's exam in 1995. Thirty-six applicants, including 11 minorities, passed the 1995 written fire captain's exam. Unlike the 1991 exam, minorities were spread evenly throughout the eligibility list. The MFD made 32 promotions from the 1995 eligibility list and 11 of those were minorities. Kohn took the test and ranked number one on the eligibility list. The MFD promoted him to fire captain on August 8, 1995.

At the trial on Kohn's discrimination charge relating to the 1991 exam, each party produced an expert to discuss whether there was statistical evidence of discrimination. Kohn also presented evidence of his damages, including lost wages, emotional harm, and harm to his reputation.

Following a three-day trial on the merits, the district court found that the 1991 fire captain's exam had a statistically significant disparate impact on minorities. It determined that Kohn sustained wage losses of $35,079.97, emotional harm damage of $100,-000, and damage to reputation of $100,000. It then trebled the compensatory damages for a final award of $705,239.91. The court amended several findings, but denied MFD's motion for a new trial. MFD appeals.

## ISSUES

I. Did the Minneapolis Fire Department's continuing promotions from the 1991 eligibility list constitute continuing violations, so that

the statute of limitations for filing a disparate impact discrimination claim did not begin to run until the date of the final promotion from the list?

II. Did the district court use the proper analysis to conclude that the 1991 fire captain's examination had a statistically significant adverse impact on minority firefighters?

III. Does the record support the district court's award of damages?

## ANALYSIS

An appellate court need not defer to the district court's decision on a purely legal question. *A.J. Chromy Constr. Co. v. Commercial Mechanical Servs., Inc.*, 260 N.W.2d 579, 582 (Minn.1977). Findings of fact will not be reversed unless clearly erroneous. *Citizens State Bank of Hayfield v. Leth*, 450 N.W.2d 923, 925 (Minn.App.1990).

## I.

■ The first issue is whether the Minnesota Human Rights Act (MHRA) one-year statute of limitations bars Kohn's claim. As a preliminary matter, we must ascertain the date on which Kohn commenced this action for purposes of calculating its timeliness.

A person may file a discrimination charge with the district court, a local commission or the Commissioner of Human Rights. Minn. Stat. § 363.06, subd. 3 (1996). If the local commission dismisses the charge or fails to take certain actions within 45 days, the complainant may then bring a civil action. Minn. Stat. § 363.117 (1996).

MFD claims that the relevant date was April 4, 1995, when Kohn began his district court lawsuit. The statute, however, specifically authorizes a person to file a discrimination charge with a local commission first, as Kohn did on July 8, 1994. Thus, July 8, 1994, is the date on which Kohn commenced this action for purposes of the statute of limitations determination. Minn.Stat. § 363.06, subd. 6.

We then address the issue of whether Kohn commenced this action within the statutory period. This court must determine whether the last discriminatory act occurred when the MFD gave the test, or when it created the eligibility list, or whether continuing violations occurred each time it made a promotion from the list that did not include Kohn, the last of which occurred on July 14, 1993. If the former, the action fell outside of the one-year statute of limitations; if the latter, the action was timely.

■ A complainant must bring an unfair discriminatory action claim "within one year after the occurrence of the practice." Minn. Stat. § 363.06, subd. 3. But discriminatory acts that persist over a period of time may constitute continuing violations. *Sigurdson v. Isanti County*, 448 N.W.2d 62, 66 (Minn. 1989). Continuing violations can prevent the expiration of the statute of limitations. *Id.* Even though a discriminatory act may have some continuing consequences, this alone is not enough to extend the limitations period. *Id.* at 67. Nor is mere continuation of employment sufficient. *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980). Instead, the "proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." *Id.* (quoted in *Sigurdson*, 448 N.W.2d at 67). The court must determine whether a present violation exists, rather than whether there are continuing effects from earlier employment decisions. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) (cited in *Sigurdson*, 448 N.W.2d at 67).

MFD contends that Kohn's failure to obtain a promotion was merely an effect of the allegedly discriminatory test or eligibility list, rather than a continuing violation. It compares Kohn's situation to other employment actions resulting in adverse effects that did not constitute continuing violations, including a seniority plan resulting in a demotion or a tenure denial leading to eventual termination. *See Lorance v. AT & T Techs., Inc.*, 490 U.S. 900, 911–12, 109 S.Ct. 2261, 2268–69, 104 L.Ed.2d 961 (1989) (holding allegedly discriminatory adoption of seniority plan, rather than subsequent demotion resulting from seniority plan, triggered limitations period), *superceded by statute as stated in Landgraf v. USI Film Prods.*, 511 U.S. 244, 251, 114 S.Ct.

1483, 1490, 128 L.Ed.2d 229 (1994) (recognizing amendments in 42 U.S.C. § 2000e–5(e)(2) responded to holding in *Lorance* by expanding employee's rights to challenge discriminatory seniority systems); *Ricks*, 449 U.S. at 258, 101 S.Ct. at 504 (holding job termination that occurred as a result of earlier allegedly discriminatory denial of tenure was effect of earlier act, not continuing violation). Likewise, MFD contends that Kohn's failure to obtain a promotion was an effect of the 1991 promotional list, not a continuing violation in itself that would extend the statute of limitations.

In this case, the failure to promote was continuing; it occurred 17 times. The continuing failure to promote resulted from the examination and promotion list, as opposed to an employer engaging in a single employer act such as termination after denial of tenure or demotion following implementation of a seniority plan. We agree with the district court that this ongoing failure to promote is a continuing violation. Courts have not hesitated to apply the continuing violation doctrine where there is a failure to hire or promote because of an ongoing discriminatory policy against individuals based on race or sex. *Roberts v. North Am. Rockwell Corp.*, 650 F.2d 823, 826 (6th Cir.1981); *see Cedeck v. Hamiltonian Fed. Sav. & Loan Assoc.*, 551 F.2d 1136, 1137 (8th Cir.1977) (holding failure to promote constituted violation continuing at least through last hire for position into which applicant had inquired).

Kohn's failure to obtain a promotion was not a mere continuing effect from the discriminatory test and eligibility list. Instead, the last continuing violation occurred on July 14, 1993, when the MFD made its last promotion from the 1991 list.[1] Kohn's charge, filed on July 8, 1994, was timely under Minn. Stat. § 363.06, subd. 3.

## II.

■ MFD next contends that the record does not show that the exam had an adverse

impact on Hispanics and that the district court erred when it relied on evidence of adverse impact on minorities as a whole to find that Kohn met his burden of proof.[2]

It is an unfair employment practice for an employer "to discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of national origin or race. Minn.Stat. § 363.03, subd. 1(2)(c). Courts analyze disparate impact discrimination cases using the three-part test, consisting of a prima facie case of discrimination, an answer, and a rebuttal, set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). *Paper v. Rent–A–Wreck*, 463 N.W.2d 298, 299–300 (Minn.App. 1990), *review denied* (Minn. Jan. 14, 1991).

■ To make a prima facie showing of disparate impact, the plaintiff need not show discriminatory intent. *Sigurdson v. Carl Bolander & Sons, Co.*, 532 N.W.2d 225, 229 (Minn.1995). Instead, the plaintiff must demonstrate that "a facially neutral employment practice actually operates to exclude from a job a disproportionate number of members of the protected class." *Schlemmer v. Farmers Union Cent. Exch., Inc.*, 397 N.W.2d 903, 908 (Minn.App.1986) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 431–32, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971)). The plaintiff must meet its burden by showing that an employment practice is responsible for a statistically significant adverse impact on a "protected class." Minn. Stat. § 363.03, subd. 11. An employer may attempt to rebut the prima facie case by presenting "contrary interpretations of the plaintiff's statistical data or introduce its own data that casts doubt on the original inference of illegal discrimination." *Schlemmer*, 397 N.W.2d at 908 (holding claim not substantiated by evidence, where evidence

---

1. Under the facts of this case, it is unnecessary to address whether the end of the life of the promotion list would start the running of the statute of limitations.

2. Kohn is referred to both as being of Mexican national origin and the Hispanic race. For purposes of this opinion, we combine Kohn's protected status of national origin with the protected status of race as the district court did. *See Kahn v. Pepsi*, 526 F.Supp. 1268, 1270 (E.D.N.Y.1981) (race discrimination viewed as mere refinement of charge of national origin discrimination).

showed only rate at which older employees were hired, not percentage of fired employees who were older).

After the plaintiff makes the prima facie case, the employer must justify the practice by showing it is "manifestly related to the job or significantly furthers an important business purpose." Minn.Stat. § 363.03, subd. 11. The charging party must then show that a "comparably effective practice" exists that "would cause a significantly lesser adverse impact on the identified protected class." *Id.* The district court found that Kohn had proved a prima facie case of disparate impact discrimination by a preponderance of the evidence, establishing that the 1991 exam had a statistically significant impact on minorities like Kohn. It found that MFD failed to show that the process for the 1991 exam was manifestly related to the fire captain position or significantly furthered an important business purpose. Finally, it found that, in any event, Kohn showed that comparably effective practices existed with significantly less adverse impact on minorities.

On appeal, the MFD challenges only whether the district court was required to assess the disparate impact of the exam and promotion list as to all minorities or only as to Hispanics, the specific protected class of which Kohn is a member. The issue of whether specific minority groups rather than minorities as a whole must be compared to non-minorities has been addressed in case law. If one minority group is involved, a simple ratio test may be used. *Badillo v. Dallas County Community Action Comm. Inc.,* 394 F.Supp. 694, 708 (N.D.Tex.1975). However, the difficulty arises when the comparison includes several minority groups who may have suffered differing degrees of discrimination, if any. *Rich v. Martin Marietta Corp.,* 522 F.2d 333, 346 (10th Cir.1975). Thus, the court may have to consider minority groups separately to determine the actual discrimination occurring against the particular group at issue. *See 2 Empl. Discrim.* (MB) § 22.09 (Dec.1994).

■ This determination becomes important because a certain amount of disparity must be present before it is legally sufficient to indicate disparate impact. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975) (requiring showing that tests in question select applicants for promotion in a "racial pattern [that is] significantly different from that of the pool of applicants."). The human rights department generally applies the "four-fifths" rule to determine whether evidence of adverse impact is present. Minnesota Dep't of Human Rights, *Methods for Determining Adverse Impact: The 4/5ths Rule; Self–Study Training Unit 7* at 7.2 (Feb. 12, 1990) (providing that when selection rate for protected class group is less than four-fifths of rate for group with highest rate, will generally be regarded as evidence of adverse impact); *see* 29 C.F.R. § 1607.4(D) (1997) (four-fifths rule). Nevertheless, when the number of applicants is 25 or fewer, the results from the four-fifths rule are not considered reliable. *Methods* at 7–3. In that event, more data must be gathered or other statistical techniques used. The four-fifths rule is not a binding rule of law, but instead is the standard used for triggering investigations and producing evidence of adverse impact. *Empl. Discr.* at § 22.10[2] (Dec.1994).

The parties' statistical experts considered the 33 applicants who were rated on the eligibility list.[3] Fourteen minorities were on the list, including four Hispanics, five Native Americans, and five African Americans. But of the 17 who obtained promotions, only four were minority, including one Hispanic and three Native Americans.

Under the four-fifths rule, when the difference between the promotion rate for minorities and non-minorities is less than four-fifths or 80%, adverse impact is indicated. The parties' statistical experts agreed that only 38% of minority applicants from the eligibility list were promoted. Under the four-fifths rule, this showed that the exam had a statistically significant adverse impact on minorities.

---

**3.** The experts reached identical conclusions when assessing the effect of the test on the 36 applicants who took the written test. To avoid confusion, we will discuss the results of the 33 firefighters listed on the eligibility list.

But the experts disagreed as to the results of a comparison between Hispanics and non-minorities. Kohn's statistical expert explained that the size of the sample of Hispanics who were on the eligibility list—four—was too small to yield a stable result when comparing it to non-minorities. While acknowledging the difficulties in comparing all minorities to non-minorities when the minority group at issue was Hispanics, he explained that this could be reasonable if explicitly recognized to avoid bias. To further bolster his opinion, he cited the fact that the rate of promotion of minorities as a whole was the same as for Hispanics alone, 25%. In comparison, non-minority firefighters were eligible for promotion at a rate of 65%.

The MFD's expert concluded there were no statistical differences between Hispanic and non-minority test results but was unable to rule out the possibility that chance produced these results. He emphasized the difference in the results between the minority groups using the four-fifths rule: Native Americans scored .88, Hispanics .25, and African Americans 0.

The court was presented with other relevant information as to the history of discrimination. The Minneapolis affirmative action director testified that minorities, including Hispanics, were underutilized in the MFD job grade that includes fire captains. While 103 MFD employees were in the fire captain job grade in 1994, only seven, or 9.7%, were minorities, two of whom were African American, one was Hispanic, and seven Native American, although 20.2% were qualified for the position. Absent the past discrimination that had kept minority firefighters from being promoted to the fire captain position, there would have been 21 minority firefighters in 1994, three of whom should have been Hispanic.

The district court here credited the testimony of the expert who concluded that the results of the four-fifths rule were not stable as to Hispanics because of the small number. It therefore considered the effects of the test on minorities as a whole, as well as the other factors, including the MFD's discriminatory history against Hispanic firefighters. The court properly applied the law and the facts to conclude Kohn made a prima facie showing of adverse impact of the 1991 exam.

## III.

Finally, MFD contends the record did not sustain the court's award of damages for mental anguish and harm to reputation. When a court finds a respondent has engaged in an unfair discriminatory practice, it may award compensatory damages "in an amount up to three times the actual damages sustained" to the aggrieved party. Minn. Stat. § 363.071, subd. 2 (1996); *see* Minn. Stat. § 363.14, subd. 2 (providing section 363.071, subdivision 2, applies to actions in district court). Actual compensable injuries may include "impairment of reputation . . . , personal humiliation, and mental anguish and suffering." *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 307, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986) (citation omitted). Findings as to an award for damages under the MHRA by the district court sitting without a jury will not be set aside unless clearly erroneous, giving due regard to the district court's opportunity to judge the credibility of witnesses. *Melsha v. Wickes Cos.*, 459 N.W.2d 707, 710 (Minn.App. 1990), *review denied* (Minn. Oct. 25, 1990).

In this case, the district court awarded Kohn $100,000 damages for his emotional pain and suffering, $100,000 for damage to his reputation, and $35,079.97 for loss of pay differential and benefits. The court trebled the award for a total award of $705,239.91.

MFD argues that the district court erred because it merely adopted Kohn's proposed findings rather than conducting an analysis of the record to make the determination. This is not reversible error per se. *Bliss v. Bliss*, 493 N.W.2d 583, 590 (Minn. App.1992), *review denied* (Minn. Feb. 12, 1993). Instead, the findings must be examined to determine if they are clearly erroneous. Minn. R. Civ. P. 52.01.

MFD claims that the evidence as to Kohn's emotional harm, provided by Kohn, his wife, and his mother, was insufficient to support the award. An award of mental anguish damages may be based on subjective testimony. *Gillson v. State Dep't of Natural*

*Resources,* 492 N.W.2d 835, 842 (Minn.App. 1992), *review denied* (Minn. Jan. 28, 1993). The mental anguish need not be severe or accompanied by physical injury. *Bradley v. Hubbard,* 471 N.W.2d 670, 677 (Minn.App. 1991), *review denied* (Minn. Aug. 2, 1991). The witnesses testified as to the extensive emotional anguish Kohn suffered as a result of the unfairness of the 1991 fire captain's exam. This included severe disappointment, frustration, anxiety, and anger; it lowered Kohn's self-esteem, harmed his relationship with his children, and made him isolate him- self from his family. MFD has not shown that the district court was clearly erroneous in its award of damages.

MFD also challenges the damages awarded for harm to Kohn's reputation. An aggrieved party may obtain damages for impairment of reputation. *Minneapolis Police Dep't v. Minneapolis Comm'n of Civil Rights,* 402 N.W.2d 125, 132 (Minn.App. 1987), *aff'd,* 425 N.W.2d 235 (Minn.1988). The only witness who testified as to Kohn's loss of reputation was Kohn himself. Kohn explained he knew some co-workers were aware both that he took the 1991 exam and that he was not promoted. He felt that some "maybe thought less of [him] as a firefighter" as a result.

Unlike the testimony as to the emotional harm Kohn suffered, the evidence as to damages to his reputation is speculative. Kohn himself was not sure of the extent of the harm and there was no other evidence to support it. Further, MFD did not disseminate information as to the test rankings, except to the extent that promotions were made. Consequently, we reverse the district court's award because the evidence does not support the finding Kohn suffered damages to his reputation.

Finally, MFD challenges the decision of the district court to treble the compensatory damages. Minn.Stat. § 363.071, subd. 2, specifically authorizes an award of compensatory damages in an amount of up to three times the actual damages, without requiring findings to support the determination. *Phelps v. Commonwealth Land Title Ins. Co.,* 537 N.W.2d 271, 276 (Minn.1995). We review the district court's decision under

an abuse of discretion standard. *Id.* at 274. The district court cited the damages Kohn suffered based on discrimination by MFD, which had a long-standing practice of discriminatory employment practices. MFD has failed to show the district court abused its discretion under the facts of this case.

### DECISION

We affirm in part and reverse only as to the damages awarded for the loss of reputation.