# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1878

_____

| | | |
|---|---|---|
| John Christopher Shaver, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Independent Stave Company, doing | * | |
| business as Salem Wood Products Co., | * | |
| Inc.; Salem Wood Products Co., | * | |
| | * | Appeal from the United States |
| Appellees. | * | District Court for the Eastern |
| | * | District of Missouri. |
| _____ | * | |
| | * | |
| Equal Employment Opportunity | * | |
| Commission; Epilepsy Foundation | * | |
| of Kansas and Western Missouri; | * | |
| Epilepsy Foundation of Minnesota, | * | |
| | * | |
| Amici on Behalf | * | |
| of Appellant. | * | |

_____

Submitted: September 12, 2003

Filed: December 1, 2003

_____

Before MORRIS SHEPPARD ARNOLD, BOWMAN, and MELLOY, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

This is a harassment and retaliation case brought under the Americans with Disabilities Act (ADA), *see* 42 U.S.C. §§ 12101-12213, and the Missouri Human Rights Act (MHRA), *see* Mo. Rev. Stat. §§ 213.010-213.137, that comes to us on appeal from an order dismissing the plaintiff's claims on summary judgment. We affirm the judgment of the district court in part and reverse it in part.

Christopher Shaver has suffered from nocturnal epilepsy since he was a teenager. After an operation in which part of his brain was removed and replaced by a metal plate, he was able to get a job working at the timber mill of Salem Wood Products Company. After being fired, allegedly for insubordination, Mr. Shaver sued Salem under various theories. By the time that Salem moved for summary judgment, Mr. Shaver had abandoned most of his claims, but he continued to maintain that he had been unlawfully harassed as a result of his epilepsy and his cranial operation, that Salem had violated the anti-retaliation provisions of the ADA and the MHRA, and that Salem was liable to him under Missouri workers' compensation law. The district court ruled against Mr. Shaver on his ADA and MHRA claims and declined to exercise supplemental jurisdiction over the workers' compensation claim.

We review a district court's summary judgment order *de novo. See Darby v. Bratch*, 287 F.3d 673, 678 (8th Cir. 2002). We resolve Mr. Shaver's MHRA claims on the same basis as his federal claims. *See id.* at 682.

I.

We have suggested in dicta that it might be possible to bring a claim for a hostile work environment under the ADA, *see, e.g., Jeseritz v. Potter*, 282 F.3d 542, 547 (8th Cir. 2002), but we have never ruled directly on the matter. Today, for the reasons that follow, we join the other circuits that have decided the issue by holding that such claims are in fact actionable. *Cf. Flowers v. Southern Reg'l Physician*

*Servs., Inc.*, 247 F.3d 229, 232-35 (5th Cir. 2001), *Fox v. General Motors Corp.*, 247 F.3d 169, 175-77 (4th Cir. 2001).

Even broad, remedial statutes such as the ADA do not give federal courts a license to create causes of action after the manner of the common law. *See Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001). Rather, our rulings must be disciplined by the text of the statute itself. The ADA states that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). While the statute does not specifically mention hostile work environment, in construing a statute we must look at how its text was understood at the time that it was passed.

The drafters of the ADA borrowed the phrase "terms, conditions, and privileges of employment" directly from Title VII of the Civil Rights Act of 1964. *Compare* 42 U.S.C. § 12112(a) *with* 42 U.S.C. § 2000e-2(a)(1). As early as 1971, courts had construed the phrase in Title VII to create an action based on a hostile work environment, *see, e.g., Rogers v. EEOC*, 454 F.2d 234, 238-39 (5th Cir. 1971), *cert. denied*, 406 U.S. 957 (1972), and by the time that the ADA was passed in 1991, this interpretation was clearly established as the controlling federal law on the subject. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-66 (1986). Thus, when Congress included the phrase "terms, conditions, and privileges of employment" in the ADA, it was using a legal term of art that prohibited a broad range of employment practices, including workplace harassment. *Cf. Cannon v. University of Chicago*, 441 U.S. 677, 696-98 (1979).

In determining whether a hostile work environment claim has been made out under the ADA, we think it proper to turn to standards developed elsewhere in our anti-discrimination law, adapting them to the unique requirements of the ADA. To be entitled to relief, it seems to us that Mr. Shaver must show that he is a member of

the class of people protected by the statute, that he was subject to unwelcome harassment, that the harassment resulted from his membership in the protected class, and that the harassment was severe enough to affect the terms, conditions, or privileges of his employment. *Cf. Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906, 907-08 (8th Cir. 2003).

The ADA's employment provisions protect people who are "qualified individual[s] with a disability." 42 U.S.C. §§ 12111(8), 12112(a). In this case, neither party disputes that Mr. Shaver was qualified for his job at Salem's lumber mill. Salem does argue, however, that Mr. Shaver is not "disabled" within the meaning of the statute. A disability is an "impairment that substantially limits one or more ... major life activities." *See* 42 U.S.C. § 12102(2)(A). Furthermore, one can be within the statute if one is regarded (accurately or inaccurately) as having such an impairment or if one has a record of such an impairment in the past. *See* 42 U.S.C. § 12102(2)(B)-(C).

Before his operation, it is undisputed that Mr. Shaver's epilepsy caused severe seizures of the kind and frequency that this court has held impair "major life activities" such as speaking, walking, or seeing. *See Otting v. J.C. Penney Co.*, 223 F.3d 704, 710-11 (8th Cir. 2000). He thus has a record of impairment. Our review of the record also persuades us that at least some of his co-workers regarded Mr. Shaver as "stupid" and "not playing with a full deck" because of his epilepsy and resulting operation. And, since thinking is a major life activity, *see Brown v. Lester E. Cox Med. Ctrs.*, 286 F.3d 1040, 1044-45 (8th Cir. 2002), we conclude as well that a jury could find that Mr. Shaver qualifies as disabled because he was regarded as disabled.

Our review of the record indicates that there is no real factual dispute about whether Mr. Shaver was harassed. (The severity and legal consequence of that harassment are separate questions that we deal with below.) There is ample evidence,

for instance, that he was routinely referred to as "platehead." Salem argues that the harassment was not the result of his disability, claiming that the name "platehead" was linked to the physical fact that Mr. Shaver has a plate in his skull, rather than with any impairment as such. We think that this distinction may be too fine for us, but in any case the meaning of the statements (that is, what inference to draw from the words used) is properly a matter for the jury. There is certainly nothing in the record to suggest that those who called Mr. Shaver "platehead" made the distinction suggested by Salem. The distinction itself, moreover, may well be meaningless: Even if one calls a person "pegleg" because he has a peg leg rather than because he has trouble walking, it is nevertheless the case that the nickname was chosen because the person was disabled.

With the question of the effect of the harassment on the "terms, conditions, and privileges" of Mr. Shaver's employment we come to the heart of this case. In order to be actionable, harassment must be both subjectively hostile or abusive to the victim and "severe and pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). On the other hand, we have repeatedly emphasized that anti-discrimination laws do not create a general civility code. *See, e.g., Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003). Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law.

Taking the evidence in the light most favorable to Mr. Shaver, we have little difficulty concluding that a jury could find that he found the harassment by his co-workers hostile or abusive. The more difficult question is whether the behavior fell within the elusive category of "objectively ... offensive," *see Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). Mr. Shaver's co-workers referred to him as "platehead" over a period of about two years. Some of the co-workers were supervisors, and some were not. Some of the co-workers stopped using the name

when Mr. Shaver asked them to, and others did not. Use of nicknames is widespread at the mill, and while this fact does not render the name applied to Mr. Shaver inoffensive, it might reduce its offensiveness. Several co-workers suggested that Mr. Shaver was stupid. On one occasion, a co-worker said that Mr. Shaver "pissed in his pants when the microwave was on," but this uglier statement seems to have occurred outside of Mr. Shaver's presence, a fact that lessens but does not undo its offensiveness.

Taken as a whole, we conclude that the verbal harassment here does not rise to the same level as that in cases where we have granted relief. For example, in *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1264-65 (8th Cir. 1997), we allowed a suit to continue where the plaintiff had been subject to verbal abuse, but in that case there was evidence that a supervisor had repeatedly singled the plaintiff out and that she had been hospitalized twice as a result of the psychological trauma that she suffered. Showing some tangible psychological condition is not necessary to make out a hostile work environment claim, but it may be taken into account. *Harris*, 510 U.S. at 22-23. While Mr. Shaver was upset about the harassment at work, it was not so severe as to result in any psychological treatment. In *Reedy*, 333 F.3d at 909-10, we upheld a hostile work environment claim based on harassing words, but the words at issue were death threats directed specifically at the plaintiff over a sustained period of time. In contrast, there is no allegation or evidence in this case to suggest that any of the harassment of Mr. Shaver was explicitly or implicitly threatening. Nor does this case involve harassing conduct of a physical nature as was found actionable in many of the cases that Mr. Shaver cites. *See, e.g., Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1159 (8th Cir. 1999); *Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 761-62 (8th Cir. 1998).

Mr. Shaver advances two other arguments in an effort to transform the verbal harassment to which he was subjected into an actionable hostile work environment. First, he asserts that the harassment resulted from the unauthorized disclosure of his

medical condition by his supervisor. Viewing the evidence in the light most favorable to Mr. Shaver, we conclude that it would support a finding that the supervisor did disclose Mr. Shaver's medical condition without his authorization. Shortly before the name "platehead" came into use, Mr. Shaver was injured on the job and taken to the hospital by his supervisor, who there learned for the first time about Mr. Shaver's epilepsy and the plate in his skull. Before then, no one at the mill seems to have been aware of Mr. Shaver's condition. Immediately thereafter, co-workers learned of the plate from the supervisor and began calling Mr. Shaver "platehead." We are uncertain as to whether this disclosure of Mr. Shaver's medical records was actionable under the ADA. *See* 42 U.S.C. § 12112(d); *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 969-70 (8th Cir. 1999). But Mr. Shaver does not in any case raise this as an independent claim for recovery on appeal (he is procedurally barred from doing so), and so we do not consider whether the facts here would support such a claim. Instead Mr. Shaver argues that because the harassment we have described resulted from the disclosure, it somehow makes the harassment more severe.

Even if the disclosure violated 42 U.S.C. § 12112(d), we note that workplace harassment and the unauthorized disclosure of medical records are different wrongs, involving different interests. Workplace harassment is forbidden in order to ensure that the "terms, conditions, and privileges of employment" are not altered for a legally impermissible reason. *See* 42 U.S.C. § 12112(a). Thus, it is a claim that can be raised under the ADA only by a "qualified individual with a disability." *See id.* In contrast, the prohibition on disclosing medical information protects a person's privacy, and one need not even be disabled in order to raise that matter. *See Cossette*, 188 F.3d at 969-70. Harassment resulting from such a disclosure would be relevant to the measure of damages on a claim for such disclosure, but because the wrong is the disclosure itself harassment need not even rise to the level of affecting the "terms, conditions, and privileges of employment" before it can furnish the basis for an award of damages.

Mr. Shaver in effect asks us to stand this last principle on its head and hold that harassment that by itself is not actionable can rise to the level of illegality by being the result of an unauthorized disclosure. We decline to do so. Medical privacy is not a "term, condition, or privilege" of Mr. Shaver's employment. In the absence of a statute, there is nothing to forbid an at-will employer from conditioning employment on the ability to disclose otherwise private information. This is precisely the reason that a separate section of the ADA deals with this issue. If Mr. Shaver's right to medical privacy under the ADA was violated, he was free to pursue a claim under that section. But he cannot do an end-run around his own procedural default by using such a claim to transform unactionable harassment into something actionable.

Mr. Shaver also asserts that the fact that he was denied promotions and opportunities because of his disability was part of the hostile work environment to which he was subjected. In support of his claim that he was denied promotions because of his disability, Mr. Shaver cites to speculations in his own deposition about the motives and actions of his supervisors, without any foundation suggesting that Mr. Shaver had personal knowledge of the matters that he was discussing. There are limits on what kinds of evidence a judge may consider in reviewing a motion for summary judgment, and inadmissible evidence obtained during discovery cannot be used to defeat such a motion. *See Mays v. Rhodes*, 255 F.3d 644, 648 (8th Cir. 2001). Since Mr. Shaver's testimony would not be admissible, we ignore it. *See* Fed. R. Evid. 602. Mr. Shaver also points to depositions by co-workers who overheard unspecified managers saying that Mr. Shaver was too stupid to be promoted or to get another position at the mill. Such statements are admissible, but there is no indication of who the managers were, or whether they were discussing real or hypothetical job openings. We conclude that even coupled with the use of the name "platehead" this vague testimony is insufficient to get Mr. Shaver's harassment claim past summary judgment.

## II.

Mr. Shaver also challenges the district court's dismissal of his retaliation claim. Salem fired Mr. Shaver after he had an argument with his supervisor, Charles Bacon. After he had commenced his suit for harassment, Mr. Shaver contacted several acquaintances for job interviews and gave them Mr. Bacon's name as a job reference. When contacted by Mr. Shaver's acquaintances, Mr. Bacon told them that he could not recommend Mr. Shaver because he had "a get rich quick scheme involving suing companies." None of the acquaintances with whom Mr. Shaver interviewed offered him a job, and he was subsequently able to find employment when he gave the name of a different former supervisor at Salem as a reference. On the basis of these facts, the district court concluded that Mr. Shaver was attempting to manufacture a retaliation claim against Salem by baiting Mr. Bacon into giving negative references because of Mr. Shaver's suit. In reaching this conclusion, the district court also relied on the fact that no one was hired by any of the acquaintances in lieu of Mr. Shaver and that Mr. Shaver intentionally gave the prospective employers the name of the supervisor with whom he had argued.

We are unable to agree with the district court's view that claims that are "manufactured" in the sense that the court used the word are not actionable. The ADA states that "[n]o person shall discriminate against any individual because ... such individual made a charge ... under this chapter." 42 U.S.C. § 12203(a). A *prima facie* case under this provision consists of proof of protected activity by the employee, adverse action taken by the employer against the employee, and a causal connection between the protected activity and the adverse action. *Cossette*, 188 F.3d at 972. The district court seems to have added an additional requirement, namely, that the party asserting the claim did not purposefully seek the adverse action. Nothing in the words of the statute or in our cases, however, suggests that the conduct of the aggrieved party, other than the party's initial protected activity, is relevant. Rather, the law focuses exclusively on the conduct of the alleged retaliator in determining whether the aggrieved plaintiff has a claim.

In support of its conclusion, the district court cited *McFadden v. State Univ. of N.Y.*, 195 F. Supp. 2d 436 (W.D.N.Y. 2002). Even if we were inclined to follow that case, nothing in it suggests that there is some "manufactured claim" exception to the retaliation provision of the ADA. In *McFadden*, the plaintiff, a university professor, learned that the tenure committee had recommended that she be denied tenure. *Id.* at 443-44. Her attorney then wrote to the university, asserting that gender discrimination had motivated the tenure decision and asking for an investigation, and the university deemed the request "premature." *Id.* at 444. Afterward, when the president of the university followed the committee's recommendation (and the recommendation of others) to deny the plaintiff tenure, the plaintiff responded by claiming that the president's decision was, in part, motivated by her attorney's letter. *Id.* at 454. While it used the term "manufacture," the *McFadden* court was making the straightforward point that it was quite impossible for the plaintiff's subsequent protected activity to have caused the committee to recommend denying her tenure. *Id.* at 455. Nor was there reason to think that the president's decision that was foreshadowed by that recommendation would have been different if no letter had been written. *Id.* Rather than announcing an exotic new "manufactured claim" defense, the court was making the pedestrian point that some claims fail because there is no demonstrable causal connection between the protected activity and the adverse action.

Our view of the matter finds support in the so-called "tester" cases, where minority applicants apply for jobs or housing that they have no intention of accepting for the sole purpose of determining whether the employer or landlord is unlawfully discriminating. *See, e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982); *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289 (7th Cir. 2000). In those cases, defendants have objected that there was no real substance to the plaintiffs' claims since those claims were created solely for the purpose of litigation. The courts, however, have advanced two different reasons for allowing such suits to proceed.

First, the mere fact of discrimination offends the dignitary interest that the statutes are designed to protect, regardless of whether the discrimination worked any direct economic harm to the plaintiffs. *See Kyles*, 222 F.3d at 297. In enacting the ADA, Congress found that "discrimination against individuals with disabilities continue[s] to be a serious and pervasive problem," 42 U.S.C. § 12101(a)(2), and that "individuals with disabilities ... have been ... subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals," 42 U.S.C. § 12101(a)(7). This language suggests that Congress was trying to protect a dignitary interest with the ADA. Second, tester cases have been allowed to proceed on a "private attorney general" theory. *See Kyles*, 222 F.3d at 299. By giving litigants an incentive to attack illegal activity by employers, Congress enlisted private self-interest in the enforcement of public policy.

In any case, there are many reasons why a person might seek a job interview even though he or she has no intention of taking the job. People may be "testing the waters" to find out what kind of reference they would get, practicing their interviewing skills, investigating a new line of work, or they may have any one of a whole host of other benign reasons for "manufacturing" a job application. *See Kyles*, 222 F.3d at 298 n.5. For these reasons, we disagree with the district court's holding that a "manufactured" claim that meets the statutory requirements cannot proceed. The issue of whether Mr. Shaver actually failed to get a job remains relevant on the question of the extent of his damages, but even if the whole situation was "manufactured," he would still have a claim for nominal damages, and in the proper circumstances, for attorneys' fees, exemplary damages, and injunctive relief.

Having dealt with the district court's legal holding, the question remains whether the evidence here, taken in the light most favorable to Mr. Shaver, presents a triable issue for a jury. We conclude that it does. Contrary to Salem's arguments, negative job references can constitute adverse, retaliatory action as a matter of law.

*See Smith*, 109 F.3d at 1266. In his deposition, Mr. Bacon denied that his words constituted a negative recommendation, and also denied that he was retaliating against Mr. Shaver. But it is for a jury to decide whether Mr. Bacon is to be believed, whether his interpretation of events is consistent with the rest of the evidence, and whether his recommendations caused prospective employers to reject Mr. Shaver's applications. Furthermore, the district court's conclusion that Mr. Shaver had no real intention of seeking a job with his acquaintances rests on contestable inferences from circumstantial evidence. The same is true of the district court's suggestion that the acquaintances were somehow involved in this alleged scheme. Both of these issues are relevant to the extent of the damages that Mr. Shaver suffered and on the present record are matters for the jury to decide.

## III.

There are a few remaining issues that we must resolve. First, we agree with the district court's holding that Mr. Bacon was an agent of Salem and that Salem can be properly charged with any action that he took regarding recommendations of Mr. Shaver. Second, Independent Stave Company, Inc., asks that we rule that it is an independent company and that it therefore is not liable for any of Salem's actions. This issue was not reached by the court below, and on remand the district court will be obligated to deal with it if Independent pursues the matter. We decide that Salem's remaining arguments are without merit.

## IV.

For the reasons set forth above, the district court's judgment is affirmed in part and reversed in part. We remand the case for further proceedings consistent with this opinion.

_____