**Lester WENIGAR, Respondent,**

v.

**Lee JOHNSON, d/b/a Johnson's, Johnson's Sanitation, and Stratton Farms, Appellant.**

Nos. A05–158, A05–473.

Court of Appeals of Minnesota.

April 4, 2006.

Eric Magnuson, Peter Gray, Rider Bennett, L.L.P., Minneapolis, MN; and Felix Mannella, Babcock, Neilson, Mannella, Lafleur & Klint, P.L.L.P., Anoka, MN, for appellant.

Claire Schaff, Connor, Satre & Schaff, L.L.P., Cambridge, MN, for respondent.

Considered and decided by MINGE, Presiding Judge, RANDALL, Judge, and COLLINS, Judge.*

## OPINION

R.A. RANDALL, Judge.

Respondent Lester Wenigar brought an action against appellant Lee Johnson, his former employer, asserting violations of the Fair Labor Standards Act (FLSA), disability discrimination under the Minnesota Human Rights Act (MHRA), violations of Minn.Stat. §§ 181.13, 181.79, and intentional infliction of emotional distress. The district court found Johnson liable for intentional infliction of emotional distress and for violations of the MHRA and the FLSA. The court later denied Johnson's new trial motion and partially granted Wenigar's petition for an award of attorney fees. Johnson appeals from the denial of his motion for a new trial and from the fee award. With respect to the FLSA claim, Johnson argues that (1) he is exempted from the overtime provisions of the FLSA because he is employed in agriculture and his farm business was not an "enterprise engaged in commerce;" (2) the district court abused its discretion in awarding Wenigar FLSA liquidated damages because Johnson is entitled to the benefit of the "good faith" defense; and (3) the district court clearly erred by finding that Wenigar worked 24 hours a day, six days a week. With respect to the MHRA claim, Johnson argues that (1) the MHRA does not include a cause of action for "disability hostile work environment;" (2) Wenigar did not satisfy the requirements of a hostile-work-environment claim; and (3) there was no basis for an MHRA damage award. Johnson also argues that (1) the award of attorney fees under the FLSA and the MHRA must be reversed because Wenigar cannot prevail on those claims; and (2) the district court erred in finding Johnson liable for intentional infliction of emotional distress. Affirmed in part, reversed in part, and remanded.

## FACTS

Lee Johnson, appellant, a pig farmer, owns and operates a farm with approximately 700 hogs. As a way to feed his pigs, appellant made arrangements with various restaurants, grocery stores, and hotels to collect leftover and discarded food. Each business places its discarded food in large buckets or cans that are collected by appellant's employees. The discarded food is hauled to the pig farm where it is eventually fed to the pigs.

Appellant also owned a sanitation hauling business. Appellant's sanitation business hauled refuse from commercial businesses to local landfills. His sanitation and food collection routes were separate and unrelated. He eventually sold the sanitation business in 2000.

All of appellant's businesses, which he owned as sole proprietorships, had the same address and were operated from the same location and office. Appellant's as-

---

* Retired judge of the district court, serving as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

sets and businesses were intermingled on one tax return.

Lester Wenigar, age 57, respondent, was an employee of appellant. Respondent has a limited ability to read and write and an I.Q. of 54. Respondent cannot drive and does not possess a driver's license.

Until he entered the sixth grade, respondent was raised on a farm. Then his family ties were distorted by the death of his mother. Respondent and his father moved to the Twin Cities area where respondent did not live with his father but with his uncle. While living with his uncle, he primarily performed farm chores. He had no contact with his father from age the time he was 10 until he was 18. Through out his life, respondent has worked as a dishwasher at local café, in a scrap yard, was unemployed for approximately three years, and eventually found employment with appellant in 1993.

Respondent was initially hired by appellant to clean pig pens, bed pigs, wash empty food cans, and spread manure using a tractor on appellant's farm located in Andover. He worked Monday through Saturday, 7:00 a.m. to 4:30 p.m. At the start of his employment, respondent enjoyed working for appellant and would often refer to appellant as "bud" or even "dad."

Beginning sometime in 1994, respondent began working overnight on the farm, as instructed by appellant. Appellant had trouble with people breaking into and stealing from farm buildings. Although he assumed that he was getting paid for his nighttime duties, respondent did not record his time on his timecard because he was instructed not to by appellant. Appellant told him that he would be paid "when the companies [sic] not there anymore." While working his night duties, respondent normally slept three to four hours, waking up at 4:00 a.m. to prepare the food collection trucks for their routes.

During the summer of 1998, appellant moved his operations to Isanti. Respondent continued working his normal duties at the Isanti location, as well as his night watch duties. Appellant argued that he never instructed respondent to continue his night-watch duties at the Isanti location. Respondent's work routine at Isanti began at 3 a.m. by preparing the food collection trucks for their routes, collecting food from various businesses, returning to the farm to perform chores, and ending the day by washing cans. He worked nonstop beginning at 3:00 a.m. and ending at approximately 11:00 p.m. Although he retired no later than 11:00 p.m., he would awake throughout the night when needed to keep watch. He never slept through the night.

While performing duties on the farm, respondent was paid an hourly wage of $5.50 and when collecting food, he was paid $.50 per can. He was not paid overtime for the time he collected food.

Beginning in 1997, respondent's relationship with appellant began to change for the worse. Appellant began shouting at respondent every day and often accused him of not completing his work, which respondent believed to be the work of three men. He was never allowed to take breaks unless he hid in the barn without anyone's knowledge. He would request breaks but appellant told him no. Respondent attempted to take a vacation on one occasion but it was cut short because appellant demanded he return to work. Respondent was afraid of appellant. He was afraid to quit. He feared he would not find another job because appellant told everyone he was stupid and retarded. Respondent was routinely teased and insulted at work.

Respondent's living quarters on the farm were uninhabitable. The room that he lived in on the farm measured 8′ × 10′. It was essentially a storeroom over a garage with no air-conditioning, electrical outlets, windows, heat registers, carpet, or paint on the walls. Respondent often complained to appellant about his living quarters, stating it was either too hot in the summer or too cold in the winter. He often slept in appellant's office in a chair in order to stay warm or cool.

The refrigerator in the room did not work properly and respondent resorted to eating food that would not spoil. He ate food from cans on the food collection route, as did other employees. There was a microwave oven for his use but respondent testified that appellant instructed him not to use it because of the electric bill.

As a result of his working and living conditions, respondent suffered emotional and psychological injuries. Respondent's housemate, Deloris Thomas, testified that in the late 1980's and into the early 1990's, respondent was talkative, humorous, and jovial. Thomas testified that respondent is no longer the same person. She testified that beginning in 1994, respondent changed physically and emotionally, looking run-down, skinny, and sickly. Emotionally he was not talkative, happy, friendly, or outgoing. She testified that respondent slept all the time when he was not working. Respondent would often call her from work crying, complaining about appellant. She testified that respondent was afraid to "put up a fight or a fuss" because he feared that appellant would terminate his employment. When his work environment got to the point that he could not function, he would go to his hiding place in the straw to cry. Due to a work-related injury, respondent's employment with appellant ended in 2001.

Respondent sought treatment from Dr. Rebecca Thomley, a licensed clinical psychologist, after ending his employment with appellant. Dr. Thomley diagnosed respondent with post-traumatic stress disorder and dysthymia. It was Dr. Thomley's opinion that respondent suffered dreaming problems, intruding thoughts, the feeling he was being threatened, and trouble sitting still and thinking. Other symptoms included not interacting with others, changes in relationships, and isolation. Dr. Thomley described respondent as passive and vulnerable. It was Dr. Thomley's opinion that respondent experienced a traumatic event caused by another individual. She believed that it will be far too difficult for respondent to recover because his harm was intended and deliberate. She opined that he may never recover.

Appellant also called upon Dr. Thomas Gratzer, a board-certified psychiatrist, for an expert opinion. He described respondent as borderline intellectual functioning to mild mental retardation. He opined that someone with limited cognitive abilities was more vulnerable to emotional and psychological injury. It was also his impression that being called "stupid" and "retard" was an ongoing daily event while respondent was working. Dr. Gratzer testified that respondent's version of the events described a negative, antagonistic, persecutory environment, and that respondent may have developed psychiatric symptoms in this environment. Dr. Gratzer actually expected respondent to have more problems than he displayed or reported. He believed that respondent was sleep and food deprived and overworked.

For litigation purposes, Dr. Susan Phipps–Yonas, a licensed psychologist, was retained to examine respondent. She opined that respondent met the criteria for a diagnosis of post-traumatic stress disor-

der and that his abusive experiences on the farm caused his traumatic stressors.

Presently, respondent wakes every night crying and experiences nightmares. He currently takes medication to help him with emotional distress.

Respondent brought claims against appellant for (1) disability discrimination in violation of the Minnesota Human Rights Act (MHRA), Minn.Stat. § 363A (2004); (2) intentional infliction of emotional distress; (3) violation of the Federal Fair Labor Standards Act (FLSA); (4) violation of Minn.Stat. § 177, payment of minimum wages, and the Minnesota Fair Labor Standards Act; (5) payment pursuant to Minn.Stat. § 181.13 (2004); and, (6) violation of Minn.Stat. § 181.79 (2004), wage deductions for faulty workmanship, loss, theft, or damage.

The district court found that respondent had a limited mental capacity that all appellant's employees were aware of respondent's limitations, and that respondent was psychologically harmed while working for appellant. It found there was discriminatory conduct against respondent that continued and worsened throughout his employment.

The district court found that appellant owned three businesses that were operated together at the same location and that all assets were intermingled on one tax return. It also found that appellant's businesses could not be disassociated from one another and that appellant sold hogs directly to clients in Iowa and was engaged in interstate commerce. The court found that respondent worked both hauling and collecting cans of garbage and farm work and that respondent was paid for work, regardless of which business he was working for.

The district court established the following: respondent was teased, taunted, and worked in an offensive environment, which was known by appellant; appellant knew that other workers conned respondent into doing their work; appellant's conduct and actions caused respondent to be in fear of him; appellant had total power over and manipulated respondent; appellant's conduct was extreme and outrageous; respondent suffered severe emotional distress; respondent's injuries were the result of extreme and outrageous conduct by appellant; and respondent's injuries were severe and extensive, affecting his entire life.

The district court concluded that respondent was disabled, as defined under Minn. Stat. § 363.03 (now codified as 363A.03) and that appellant regarded respondent as disabled. The district court determined that respondent suffered disability discrimination and a hostile work environment due to his disability, in violation of Minn.Stat. § 363A.01, subd. 41, and that appellant should have known of the discrimination and hostile work place, which he failed to remedy. The district court determined that respondent suffered intentional infliction of emotional distress, that appellant violated the FLSA by not paying respondent for overtime, and that respondent was not entitled to a penalty for no payment after a written demand for wages under Minn.Stat. § 181.13.

After trial, appellant moved for amended findings and/or a new trial but the motion was denied. At the same time, respondent's motion for punitive damages was denied and he was granted partial award for attorney fees and disbursements. This appeal followed.

## ISSUES

I. Did the district court err in finding appellant liable under the federal and state Fair Labor and Standards Act (FLSA)?

II. Did the district court err by finding appellant liable under the Minnesota Human Rights Act (MHRA)?

III. Did the district court err in finding appellant liable for intentional infliction of emotional distress?

IV. Did the district court properly award damages and attorney fees?

## ANALYSIS

### I. Federal and State Fair Labor and Standards Act (FLSA)

Appellant argues that the district court erred by finding him liable under the FLSA. He argues that he is not liable under the FLSA because respondent was employed in agriculture and under both the federal and state FLSAs, individuals employed in agriculture are exempt from receiving overtime pay. Additionally, appellant argues that his farm business was not an enterprise engaged in commerce and therefore cannot be covered by the federal FLSA.

#### a) Federal FLSA

*Employed in Agriculture*

■ Appellant argues that respondent was exempt from receiving overtime pay because he was an employee employed in agriculture and under the state and federal FLSAs, employees engaged in agriculture are exempt from receiving overtime pay.

■ A reviewing court is not bound by and need not give deference to a district court's decision on a purely legal issue. *Modrow v. JP Foodservice, Inc.*, 656 N.W.2d 389, 393 (Minn.2003) (citing *Frost–Benco Elec. Ass'n v. Minn. Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn. 1984)).

The federal FLSA sets forth labor requirements for employees who are engaged in interstate or foreign commerce or in the production of goods for such commerce. *See* 29 U.S.C. §§ 206–07 (2004). Employers must adhere to the requirements under the FLSA unless the Act provides for an exception. One of these exceptions is if an employee is employed in agriculture. 29 U.S.C. § 213(b)(12) (2004). Under the FLSA, agriculture:

> ... includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities ... the raising of livestock, bees, fur-bearing animals, or poultry, and any practices ... performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

29 U.S.C. § 203(f) (2004).

■ In *Bayside Enterprises, Inc. v. NLRB*, the United States Supreme Court held that the definition of farming includes "both a primary and a secondary sense." 429 U.S. 298, 300, 97 S.Ct. 576, 579, 50 L.Ed.2d 494 (1977). Primary farming includes "specific practices such as cultivation and tillage of the soil, dairying, etc ...," and secondary farming is agriculture in a broader sense, including "any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidentally to or in conjunction with 'such' farming operations." *Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 762–763, 69 S.Ct. 1274, 1278, 93 L.Ed. 1672 (1949).

■ Appellant argues that respondent was employed in agriculture under the primary farming definition. Appellant relies on the wording in 29 U.S.C. § 203(f) which states that primary farming includes

"farming in all its branches" and the "raising of livestock" and argues that respondent's duties fit within this definition of an employee employed in agriculture. Appellant also relies on interpretive regulations from the United States Department of Labor (DOL). Regulations from the DOL are entitled to judicial deference and are the "primary source of guidance for determining the scope and intent of [FLSA] exemptions." *Key West, Inc. v. Winkler*, 322 Mont. 184, 95 P.3d 666, 668–69 (2004). The DOL has concluded that "[if] an employee is employed in any of these activities [listed in 29 U.S.C. § 203(f)], he is engaged in agriculture regardless of whether he is employed by a farmer or on a farm." 29 C.F.R. § 780.105(b) (2004). The DOL has further explained that "[employees] are employed in the raising of livestock ... only if their operations relate to animals of the type named and constitute the 'raising' of such animals. If these two requirements are met, it makes no difference for what purpose the animals are raised or where the operations are performed." 29 C.F.R. § 780.119. Livestock has been defined by the DOL as "domestic animals ordinarily raised or used on farms," which includes "cattle (both dairy and beef cattle), sheep, swine, horses, mules, donkeys, and goats." 29 § C.F.R. 780.120 (2004). Finally, appellant relies on the DOL's definition of "raising" which "includes such operations as the breeding, fattening, feeding, and general care of livestock." 29 C.F.R. § 780.121 (2004).

Applying these interpretive definitions to respondent's duties, we find that respondent was an employee engaged in agriculture. Respondent's primary duties were done for the sole purpose of "fattening, feeding, and the general care of livestock." *Id.* He routinely cleans and beds pigs. His work on the food collection route served only one purpose, to feed pigs.

Not only is respondent an employee engaged in agriculture under the primary farming definition, but also he is such an employee under the definition of secondary farming. Under the secondary definition of farming, agriculture is defined in a broader sense, including "any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidentally to or in conjunction with 'such' farming operations." *McComb*, 337 U.S. at 762–63, 69 S.Ct. at 1278. The United States Supreme Court has analyzed the application of this definition of agriculture in *Holly Farms Corp. v. N.L.R.B.*, 517 U.S. 392, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996).

In *Holly*, the issue was whether employees who hauled chickens from independent contractor farms to their employer were employees engaged in agriculture. *Id.* at 394, 116 S.Ct. at 1399. In order to raise its chickens for slaughter, Holly Farms sent its baby chickens to independent contractor farms to be raised and fattened. *Id.* at 395, 116 S.Ct. at 1400. Once the chickens were ready for slaughter, Holly employees, known as "live-haul crews" went out to the farms to reclaim the chickens for slaughter. *Id.* The crews were made up of truck drivers, catchers, and forklift operators. *Id.* Because all parties agreed that the live-haul crews were not employed in agriculture under the primary definition of farming (the crews did not raise livestock) the Court had to determine whether the crews where employees engaged in agriculture under the secondary definition. *Id.* at 399–400, 116 S.Ct. at 1402.

In its analysis of the meaning of secondary farming, the Court found that the crews' duties did not constitute work "performed by a farmer" because their em-

ployer had contracted the raising of the chickens to independent farmers. *Id.* at 400, 116 S.Ct. at 1402. The Court reasoned that Holly Farms lost its status as a farmer engaged in raising chickens when it contracted with the independent farmers, therefore, the crews' activities were not performed by a farmer. *Id.* The Court reasoned that Holly Farms could not "reclaim" its farmer status by merely returning to pick up the chickens. *Id.* Unlike the crews' employer in *Holly*, appellant owned both the pigs and the food collection business. There was no independent contractor carrying out the food collection. Respondent collected the food and cared for the pigs. In accordance with the holding in *Holly*, because appellant never lost his status as a farmer, neither did respondent.

Although the Court in *Holly* held that the workers' activities were not "by a farmer," the workers could still be employed in agriculture if their work was "on a farm, as an incident to or in conjunction with such farming operations." *Id.* Holly Farms conceded that the truck drivers did not work on a farm but argued that the catchers and forklift operators worked on a farm because their work was incidental to farming operations. *Id.* at 400–01, 116 S.Ct. at 1402. The Court held otherwise. *Id.* at 401, 116 S.Ct. at 1402. The Court reasoned that "to qualify for the statutory exemption, ... the work must be incidental to, or conjoined with, primary farming operations." *Id.* at 402, 116 S.Ct. at 1403. The Court reasoned that the catchers and forklift operators could not be incidental or conjoined with primary farming operations because Holly Farms was not involved in primary farming. *Id.* Furthermore, the workers activities were not incident to or conjoined with the independent contract farms because the workers had no business relationship with the independent farmers. *Id.*

Unlike the employer in *Holly*, appellant was involved in primary farming, the raising of pigs. Respondent's activities, whether conducted on the farm or while food collecting, were a result of respondent's business relationship with appellant. Respondent's work was incident to appellant's pig farming. In its analysis and to bolster its position, the Court in *Holly* found that there was "minimal overlap between the work of the live-haul crew and the independent growers' raising activities." *Id.* This is not the case here. There was sufficient overlap between respondent's work and appellant's pig raising. Obviously, respondent's duties on the farm were in support of appellant's pig raising, and so was respondent's food collection. He colleted food to feed the pigs. There was more than minimal overlap between respondent's work and appellant's pig raising. The DOL has interpreted that in order to qualify as secondary agriculture, work must be performed in connection with the farmer-employer's own farming. 29 C.F.R. § 780.137 (2004). That is the case here.

The Court in *Holly* also held that DOL regulations instruct that in "determining whether a practice is performed 'for' a farmer, it is 'highly significant' whether the practice involves property to which the farmer has title or for which the farmer otherwise had responsibility." 517 U.S. at 408, 116 S.Ct. at 1406. Here, appellant owns both the pigs and the food collection route. Appellant owns all property and has the responsibility to carry out all duties that respondent performed.

Respondent argues that he worked for two separate entities owned by appellant and that he was not employed in agriculture because his work for one of the entities was not agricultural work. Although the district court found that respondent

collected food waste for appellant, respondent never worked for the garbage hauling side of the business. The records show the food collection route was a part of the farming business and had nothing to do with Johnson Sanitation. Respondent's night watch duties were obviously in furtherance of appellant's farming operations.

*Enterprise Engaged in Commerce*

■ Appellant argues that his farm business is not an enterprise engaged in commerce and therefore his business is not covered by the overtime provisions of the FLSA.

An enterprise engaged in commerce is defined as a business that "has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person" and whose "annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated)." 29 U.S.C. § 203(s)(1)(A)(i-ii).

Appellant argues that his farming business never had an annual gross volume of sales made of at least $500,000. Tax records show appellant earned the following gross incomes: $340,520 in 1997, $209,620 in 1998, $402,935 in 1999, and $92,137 in 2000. Appellant's tax returns show he earned the following from the sale of livestock: $288,325 in 1997, $192,747 in 1998, $179,696 in 1999, and $195,233 in 2000. Records show that appellant did not gross at least $500,000 in any year. His farm business is not an enterprise engaged in commerce within the meaning of the federal FLSA.

Nor were appellant's business operations an "integrated enterprise." Respondent argues that appellant's group of business operations should be considered an "integrated enterprise" and if this rings

true, he is liable under the federal FLSA. An enterprise is defined by 29 U.S.C. § 203(r)(1) to mean:

> the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor.

■ In *Brennan v. Arnheim and Neely, Inc.*, the Supreme Court of the United States held that there are three main elements to consider when determining whether various entities constitute an enterprise. 410 U.S. 512, 518, 93 S.Ct. 1138, 1142, 35 L.Ed.2d 463 (1973). A court is to consider (1) whether the activities are related, (2) if there is unified operation or common control, and (3) if there is a common business purpose. *Id.* The three prongs of the test are "conjunctive, not disjunctive" meaning that if the businesses fail to meet any of the three prongs, there is no enterprise under the Act. *Griffin v. Daniel,* 768 F.Supp. 532, 536 (W.D.Va. 1991).

First, we determine whether or not appellant's businesses engaged in related activities. Appellant currently owns and operates a pig farm and food collection business. Until 2000, appellant also owned and operated a sanitation business. Appellant's food collection business was essentially an agreement with various businesses to pick up their discarded food so that he could use it as feed for his pigs. Appellant's sanitation business did as the name suggests; it picked up and hauled garbage from various locations to

a local landfill. The purpose of appellant's sanitation business was not related to the pig farming or food collection.

Although we do not need to consider the other two factors, we do so briefly. Next, we determine whether or not the businesses were subject to common control. Here, it is apparent that appellant owned and operated all three businesses. Therefore, they were all under common control.

Finally, we determine whether the businesses are linked together by a common purpose. "The critical inquiry is whether there is 'operational interdependence in fact.'" *Dole v. Odd Fellows Home Endowment Board,* 912 F.2d 689, 692 (4th Cir.1990) (quotation omitted). "The answer to the question whether the activities are 'related' or not ... depend in each case upon whether they serve a business purpose common to all the activities of the enterprise, or whether they serve a separate and unrelated business purpose." *Griffin,* 768 F.Supp. at 536 (citing 29 C.F.R. § 779.206(b) (1990)). The business activities in question must be in furtherance of the same business objective. *Griffin,* 768 F.Supp. at 536.

Appellant has a strong argument for his position that his businesses are not a single entity. The purpose of appellant's pig farm and food collection businesses are to raise pigs for commercial purposes. Food collection is done for the sole purpose of collecting feed for appellant's pig farm. The district court found that appellant "engages in a pig farm operation, which involves raising and selling pigs and picking up foodstuffs from local businesses to feed the pigs." Appellant's sanitation business was operated for the purpose of hauling garbage from local establishments to the local landfill, to dispose of refuse. There is no common purpose between the two businesses. Appellant's sanitation and pig farm businesses served separate and unre-

lated business purposes. A common business purpose can not solely rest upon the finding that appellant occasionally exchanged inventory or employees. *See id.* at 537.

### b) Minnesota FLSA

Appellant also cannot be held liable under the Minnesota FLSA. Under Minn.Stat. § 177.23, subd. 7(2) (2004), an individual is not an employee for purposes of the Act if he "is employed in agriculture on a farming unit or operation who is paid a salary greater than the individual would be paid if the individual worked 48 hours at the state minimum wage plus 17 hours at 1 1/2 times the state minimum wage per week."

The district court erroneously awarded respondent overtime compensation for time worked between September 17, 1999 and April 5, 2001. Due to the fact that respondent is not an employee under Minn.Stat. § 177.23, subd. 7(2), he is not entitled to the district court's award.

Minn.Stat. § 177.24, subd. 1 (2004), mandates a minimum wage for employees depending on the earnings of his employer. If the employer's annual gross sales are at least $500,000, the employer is considered a large employer and the employee's hourly minimum wage is $5.15; for a small employer, annual gross sales must be less than $500,000 and the hourly minimum wage is $4.90.

Using the hourly wage requirement for a large employer, under Minn.Stat. § 177.23, subd. 7(2), if respondent worked 48 hours at the state minimum wage plus 17 hours at one and a half times the state minimum wage per week, he would have earned $19,687.72 in 1999 and 2000 ($5.15 × 48 hours) + ($7.73 + 17 hours) = $378.61 weekly; $378.61 × 52 weeks = $19,687.72. Records show that respondent

earned $36,540.95 in 1999 and $32,590.69 in 2000. Because respondent was paid a salary greater than he would have earned if he were paid for 48 hours at the state minimum wage plus 17 hours at one and a half times the state minimum wage per week, he is not an employee for purposes of the state FLSA.[1] Appellant is not liable, on this basis, under Minnesota FLSA.

## II. Minnesota Human Rights Act (MHRA)

Appellant argues that the district court erred by finding him liable under the MHRA. He argues that the MHRA does not include a cause of action for disability discrimination as a result of a hostile work environment. We disagree.

### Disability hostile work environment

The district court found appellant liable under the MHRA for disability discrimination for a "disability hostile work environment."

Whether an action exists under the MHRA for disability discrimination as a result of a hostile work environment is one of first impression in Minnesota. We conclude that such an action does exist under the MHRA. *See Shaver v. Independent Stave Co.*, 350 F.3d 716, 722 (8th Cir.2003) (finding that a claim for a hostile work environment under the American with Disabilities Act (ADA) exists).

Statutory interpretation is a question of law subject to de novo review. *Hince v. O'Keefe*, 632 N.W.2d 577, 582 (Minn.2001). When this court interprets a statute, its goal is to "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2000). *Burkstrand v. Burkstrand*, 632 N.W.2d 206, 210 (Minn.2001).

■■■ The legislature has indicated that the MHRA is to be liberally interpreted so as to accomplish its purposes. Minn.Stat. § 363A.11 (2004). To help us determine if a cause of action exists under the MHRA, it is appropriate to call on the interpretations of the federal anti-discrimination statutes when the provisions of the federal statute and the MHRA are similar. *Kolton v. County of Anoka*, 645 N.W.2d 403, 407 (Minn.2002). In *Kolton*, the Minnesota Supreme Court concluded that because the purposes and language of Minn.Stat. § 363.03 (now codified as 363A.03) and Title I of the ADA were similar, the ADA can appropriately be used to analyze the MHRA. *Id.* at 408, 410.

Minnesota law states that it is "an unfair employment practice for an employer, because of ... disability ... to discriminate against a person with respect to ... [the] terms, ... conditions, ... or privileges of employment." Minn.Stat. § 363A.08, subd. 2(c) (2004). Disability is defined as "any condition or characteristic that renders a person a disabled person. A disabled person is any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment." Minn.Stat. § 363A.03, subd. 12 (2004); *Hoover v. Norwest Private Mortgage Banking*, 632 N.W.2d 534, 543 (Minn.2001). There is no language under the MHRA that specifically allows for a cause of action for disability discrimination as a result of a hostile work environment.

■■■ To find that a claim existed under the ADA for a hostile work environment, the *Shaver* court looked to the intent of the drafters of the ADA and concluded

---

**1.** Even if we were to use the minimum wage for a small employer, appellant would not be found liable under the Minnesota FLSA.

that Congress intended to include a cause of action for a hostile work environment under the ADA because the language used "prohibited a broad range of employment practices, including workplace harassment." *Shaver*, 350 F.3d at 720. Because the language of the MHRA is similar to the language used in the ADA and their purposes are identical, we conclude that a cause of action exists under the MHRA for disability discrimination as a result of a hostile work environment.

■ Appellant next argues respondent has not proven all elements of his claim. Specifically, he argues that respondent has failed to prove (1) he is a member of a protected group; (2) any harassment was based upon a disability; and (3) any harassment affected the terms, conditions, or privileges of his employment.

■ To prevail on a hostile work environment claim, respondent must show (1) membership in a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and his or her membership in the protected group; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that appellant knew or should have known of the harassment and failed to take prompt and effective remedial action. *Goins v. West Group*, 635 N.W.2d 717, 725 (citing *Carter v. Chrysler*, 173 F.3d 693, 700 (8th Cir.1999)).

A reviewing court is not bound by and need not give deference to a district court's decision on a purely legal issue. *Modrow*, 656 N.W.2d at 393.

■ Appellant argues that respondent is not a member of a protected class. We find that he is. Respondent is disabled because he has a mental impairment that materially limits one or more major life activities. He is illiterate and cannot obtain a driver's license. Respondent is disabled because he is vulnerable as a result of a low IQ, has limited mental capacity, and has no formal education. Coupled with his age, these factors materially limit his social and economic opportunities. In finding that respondent is disabled, we do so narrowly and do not conclude that having a low IQ, alone, is a disability for purposes of the MHRA.

■ Respondent suffered unwelcomed harassment and was discriminated against because of his disability. Appellant and respondent's co-workers referred to him as slow and often made derogatory comments as a result of his IQ and limited mental capacity. The district court found that appellant and his co-workers were aware of his limited mental capacity. He was constantly called names being referred to as "stupid," "you f—king dumb ass," "brain dead" and "idiot." Appellant was aware of the name calling and even did it himself. Appellant called respondent a "dumb f—ker," "stupid," "retard," "no good sh-t," and often told him that he came from a retarded or stupid family. We recognize that "[c]onduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law" but find that the conduct here was more than merely rude, abrasive, unkind, or insensitive. *Shaver*, 350 F.3d at 721.

■ We conclude that appellant's harassment affected respondent's working environment. The eighth circuit court of appeals has held that "[i]n order to be actionable, harassment must be both subjectively hostile or abusive to the victim and 'severe and pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive.'" *Shaver*, 350 F.3d at 721 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295, (1993)). The

insults were a direct result of his perceived low IQ, limited mental capacity, and other lifestyle shortcomings.

■■■ We find that respondent's co-workers and appellant's conduct were so "severe and pervasive" as to "alter the conditions of [respondent's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). The objectionable environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662, (1998) (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993)).

■■■ In ascertaining whether an environment is sufficiently hostile or abusive to support a claim, we look at the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787–88, 118 S.Ct. at 2283 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. at 371).

Respondent was manipulated into working early in the morning after washing cans late into the night and as a result was afforded little time to eat and sleep. He was harassed, chastised, and berated if he tried to take a break to rest and eat. He was constantly made fun of and taunted, causing him to suffer physical illness requiring the use of medication. There is sufficient evidence to find that the harassment was so severe or pervasive to alter the conditions of respondent's employment and create an abusive working environ-

ment. We conclude that appellant was aware of the conduct and failed to take action to remedy the problem.

## III. Intentional infliction of emotional distress

■■■ Appellant argues that the district court erred in finding that he was liable for the intentional infliction of emotional distress. He argues that the intentional infliction of emotional stress is limited to cases involving egregious facts and that respondent has not met the required high threshold of standard of proof.

### Extreme, outrageous, and intentional or reckless

■■■ Appellant argues that respondent failed to prove that his conduct was extreme, outrageous, and intentional or reckless.

■■■ To prove the intentional infliction of emotional distress, respondent must show appellant's conduct (1) was extreme and outrageous; (2) was intentional or reckless; (3) caused emotional distress; and that the emotional distress caused by appellant (4) was severe. *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 438–39 (Minn.1983).

■■■ Respondent's standard of proof is a "high threshold" and for appellant's conduct to be actionable, it must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Id.* at 439 (quoting *Haagenson v. Nat'l Farmers Union Prop. and Cas. Co.,* 277 N.W.2d 648, 652 n. 3 (Minn.1979)). Respondent must prove that his mental distress was so severe "that no reasonable man could be expected to endure it." *Id.* at 439 (citing Restatement (Second) of Torts 46 cmt. j (1965)). Intentional infliction of emotional distress is "sharply limited to cases involving par-

ticularly egregious facts." *Id.* We conclude that respondent suffered such emotional distress.

Appellant's behavior in light of the surrounding facts and circumstances constitutes extreme and outrageous behavior. As a result of the name calling and the taunting, respondent hid in a barn to cry. He often called his housemate crying, complaining about appellant's behavior. Respondent's condition materially deteriorated over the years he worked for appellant. He was fearful of appellant to the point that he would not quit his job because he was fearful that appellant would tell other potential employers that he was stupid and dumb. Appellant's conduct was extreme and outrageous. A reasonable person would not be expected to endure the conduct that appellant was subjected to.

**Suffer severe distress**

■ Appellant argues that respondent did not suffer severe distress as a result of his conduct. He argues that respondent failed to show that his distress was caused by his actions.

■ When determining whether an individual has suffered severe distress, we "may look to '[t]he intensity and the duration of the distress.'" *Cafferty v. Garcia's of Scottsdale, Inc.,* 375 N.W.2d 850, 853 (Minn.App.1985) (citing Restatement (Second) of Torts 46 cmt. j (1965)). "If the claimed distress is of the type that people commonly encounter and endure in their lives, then the claim should not even be submitted to the jury." *Id.* at 853. The emotional distress suffered by respondent "must be so severe that no reasonable person could be expected to endure it." *Id.* Appellant may escape liability "if the distress is exaggerated in comparison to that which a reasonable man would experience under the circumstances, unless the exaggerated distress results from a pecu-

liar susceptibility to such distress of which the defendant had knowledge." *Id.* at 854.

Respondent suffered severe distress as a result of appellant's conduct in the form of nightmares, crying spells, and feelings of hurt. His condition deteriorated over the years he worked for appellant. He suffered physical illness as a result and currently takes medication to control his illness. We find that respondent's emotional distress is indicative of distress that no reasonable person could be expected to endure. Expert testimony supports the conclusion that respondent suffered severe distress as a result of appellant's conduct.

The record shows that respondent suffered from post-traumatic stress disorder (PTSD). One expert testified that respondent's experiences on the farm constituted the traumatic stressor for PTSD.

**IV. Damages and Attorney Fees**

The district court awarded the following damages: $150,000 for emotional distress, $50,000 for future emotional distress, $39,819 for past economic loss, $119,909.50 pursuant to the MHRA, and $79,638 pursuant to the federal and Minnesota FLSA. Total damages awarded by the district court totaled $439,366.50.

**Federal and Minnesota FLSA**

■ Because we conclude that appellant is not liable under the federal and Minnesota FLSAs, respondent is not entitled to damages awarded pursuant to those acts nor is he entitled to damages for any past economic loss awarded for unpaid overtime.

**Intentional Infliction of Emotional Distress**

■ Appellant argues that the district court erred by awarding respondent damages for his emotional distress from 1996 to present. He argues that this is contrary to the evidence and to the two-year

statute of limitations for claims of intentional infliction of emotional distress.

 We review an award of damages for abuse of discretion. *Robert W. Carlstrom, Co., Inc. v. German Evangelical Lutheran St. Paul's Congregation of the Unaltered Augsburg Confession at Jordan,* 662 N.W.2d 168, 173 (Minn.App.2003).

The district court awarded respondent $150,000 for emotional distress from January 1, 1996 to June 4, 2004. Appellant argues the record shows that respondent was satisfied and enjoyed his time working for appellant until 1997 and that for the court to award damages for emotional distress before this period is in error. The district court found that discriminatory conduct began, continued, and worsened throughout respondent's employment and awarded damages pursuant to the continuing doctrine violation.

 Appellant argues that respondent's claim for intentional infliction of emotional distress cannot be tolled under the continuing tort or violation doctrine. In Minnesota, the continuing violation doctrine is most commonly applied in discrimination cases involving wrongful acts that take place over a period of time, rather than in a series of discrete acts. *See Sigurdson v. Isanti County,* 448 N.W.2d 62, 66–67 (Minn.1989); *see also Giuliani v. Stuart Corp.,* 512 N.W.2d 589, 595 (Minn. App.1994). But it has been applied to other areas of law. *See Northern States Power Co. v. Franklin,* 265 Minn. 391, 394, 122 N.W.2d 26, 28–29 (1963) (trespass); *State Dep't of Labor Indus. v. Wintz Parcel Drivers, Inc.,* 555 N.W.2d 908, 912 (Minn.App.1996) (workers' compensation coverage), *review granted in part, decision modified,* 558 N.W.2d 480 (Minn.1997). There is no record of the continuing tort or violation doctrine being applied to a claim of intentional infliction of emotional distress. We conclude that the "continu-

ing doctrine" does not apply to the facts before us. The damages awarded are restricted by the two-year statute of limitations. The question of which statute of limitations to apply is one of law, which this court reviews de novo. *Manteuffel v. City of North St. Paul,* 570 N.W.2d 807, 809 (Minn.App.1997).

 Minn.Stat. § 541.07(1) (2004) states that "the following actions shall be commenced within two years: (1) for libel, slander, assault, battery, false imprisonment, or *other tort, resulting in personal injury* . . . ." (emphasis added). Appellant is correct; there is two-year statute of limitations for commencing an intentional infliction of emotional distress claim. *See Wallin v. Minnesota Dept. of Corrections,* 598 N.W.2d 393, 400 (Minn.App.1999), *review denied* (Minn. Oct. 21, 1999). Damages awarded for past emotional distress need to be adjusted to the two-year statute of limitations.

### MHRA

 We also conclude that respondent is entitled to damages under the MHRA but for an amount different from the district court's award. Whether the district court's award for damages under the MHRA was proper is reviewed by this court under an abuse of discretion standard. *Phelps v. Commonwealth Land Title Insurance Co.,* 537 N.W.2d 271, 274 (Minn.1995). Findings as to an award for damages under the MHRA by the district court sitting without a jury will not be set aside unless clearly erroneous, giving due regard to the district court's opportunity to judge the credibility of witnesses. *Kohn v. City of Minneapolis Fire Dept.,* 583 N.W.2d 7, 14 (Minn.App.1998), *review denied* (Minn. Oct. 20, 1999).

The district court awarded respondent damages under the MHRA in the amount

of $119,909. The district court arrived at this figure by adding the amount awarded for past and future emotional distress to the amount awarded for past economic wage loss and then dividing that amount by 50%, which is permitted under *Kohn*. *Id.* (stating that when a court finds unfair discriminatory practice, it may award compensatory damages "in an amount up to three times the actual damages sustained."). We conclude that the district court was in error to add to the amount of damages awarded for past and future emotional distress ($200,000) the amount of $39,819 for past economic wage loss. The correct amount of damages under the MHRA, excluding the amount for past economic wage loss and keeping with the equation of the district court, is $100,000.

■ Appellant argues that the district court was wrong to award respondent damages under the MHRA in addition to the amounts already awarded. He argues that the award fails to adhere to the purpose of the MHRA, which is to put the respondent back into the same position he would have been in had no discrimination occurred. *Brotherhood of Ry. and S.S. Clerks, Freight Handlers, Exp. and Station, et al.*, 303 Minn. 178, 195, 229 N.W.2d 3, 13 (1975). He argues that respondent received a "windfall."

Respondent argues that when a court finds unfair discriminatory practice, it may award compensatory damages "in an amount up to three times the actual damages sustained." *Kohn*, 583 N.W.2d at 14 (quoting Minn.Stat. 363.071, subd. 2 (1996); now codified as 363A.29, subd. 4(a)). We find respondent's argument persuasive.

In *Phelps*, where disability discrimination was proven, the petitioner challenged the district court's award of compensatory damages in the amount twice that of the actual damages proved at trial pursuant to Minn.Stat. 363.071, subd. 2 (now codified

as Minn.Stat. 363A.29, subd. 4(a)). *Phelps*, 537 N.W.2d at 274. The petitioner put forth arguments similar to appellant.

The supreme court in *Phelps* held that multiplication of damages under the statute was proper. *Id.* at 274. The court held that because the statute gave no guidelines as to when and under what circumstances a court may multiply damages, it was in the discretion of the district court when to multiply damages. *Id.*

The petitioner next argued that before any multiplication of damages occurred, the court had to find that the victim was not fully compensated. *Id.* at 275. The court disagreed concluding "after an initial finding of damages, a trial court need not make an additional finding that uncompensated damages exist prior to multiplying damages." *Id.*

Next, the petitioner argued that the district court failed to make findings in support of its award of double damages. *Id.* at 276. The supreme court has held that the statute:

> does not require a trial court to make any findings prior to multiplying damages. If the legislature had said damages may be trebled only if the trier of fact determines that actual damages are nominal or uncompensated damages exist, then failure by the trial court to make findings prior to multiplying damages would be error. However, since the legislature has not made findings of any sort a requirement, we conclude that no findings are necessary to support a trial courts' decision to multiply damages. *Id.*

Finally, the petitioner argued "that the trial courts' award of both punitive damages and double actual damages constituted an unfair double recovery for punitive damages." *Id.* Again, the supreme court has disagreed, concluding that "multiple

compensatory damages are not duplicative of punitive damages where at least one objective of multiple compensatory damages is nonpunitive. Thus, the district courts' award of both punitive damages and double actual damages does not constitute an unfair double recovery for punitive damages." *Id.* at 277.

Based on the above analysis, the district court properly awarded damages under the MHRA. It awarded damages as a result of respondent's emotional distress as a result of his discrimination. The district court found that highly egregious conduct occurred. Accordingly, the district court had discretion to fashion a damage award appropriate under the circumstances.

After considering the issues, we conclude that respondent is entitled to damages for past and future emotional distress, damages pursuant to the MHRA along with attorney fees and costs and disbursements awarded by the district court. This case is remanded to the district court so that damages may be recalculated.

**DECISION**

We conclude that appellant is not liable under the federal or state FLSAs.

We find that a cause of action does exist under the MHRA for a hostile work environment as a result of discrimination based on a disability, and that appellant caused a hostile environment for respondent based on respondent's mental disability.

The district court properly found that appellant's conduct toward respondent was extreme, outrageous, and intentional or reckless, which intentionally inflicted severe emotional distress on respondent.

Respondent is entitled to additional damages under the MHRA along with

damages for appellant's intentional infliction of emotional distress.

Because we are reversing in part and remanding in part and that affects the damages amount owed to respondent, we remand to the district court to recalculate damages in accordance with this opinion.

**Affirmed in part, reversed in part, and remanded.**